943 So.2d 335 (2006)
STATE of Louisiana
v.
Farrell PORCHE.
No. 2006-KK-0312.
Supreme Court of Louisiana.
November 29, 2006.
*336 Charles C. Foti, Jr., Attorney General, Paul D. Connick, Jr., District Attorney, Megan L. Gorman, Jacqueline F. Maloney, Assistant District Attorneys, for Applicant.
DeSalvo, DeSalvo & Blackburn, Frank G. DeSalvo, New Orleans, F. Gerald DeSalvo, Jr., Gretna, for Respondent.
Prior report: 930 So. 2d 6.
PER CURIAM.
The state has charged defendant/respondent by bill of information with possession of cocaine in an amount greater than 28 grams but less than 200 grams. La.R.S. 40:967(F)(1)(a). Respondent moved to suppress the evidence, and after conducting a hearing in March 2005, the trial court granted the motion. The Fifth Circuit denied the state's application for review of that ruling, finding "no abuse of the trial court's discretion in this case." State v. Porche, 05-0982 (La.App. 5th Cir.1/10/06). We granted the state's application to reverse the rulings below because we agree with the state that the probable cause basis for the search warrant authorizing recovery of the evidence was not derivatively tainted by any prior illegal conduct of the police.
As detailed in the affidavit of probable cause supporting the search warrant and in the testimony of Lieutenant Ronald Hoefeld at the hearing on the motion to suppress, the events leading to the seizure of cocaine in the present case began on the morning of December 30, 2003 with a call to the Jefferson Parish Sheriff's Office placed by Louette Young, who reported a possible burglary in progress at the Citrus Creek Apartments on Citrus Boulevard in Kenner, Louisiana. Young met with sheriff's deputies in the parking lot of the apartment complex, told them that she had heard the sound of glass breaking in her apartment and other noises from inside and expressed concern that someone had broken into her apartment and was still there. The deputies found no evidence of forced entry but entered the apartment to secure the premises and found clothing strewn throughout the apartment and several pieces of furniture pulled in front of the door leading to the master bedroom. During a protective sweep of the apartment, the deputies entered the bedroom and discovered a glass container and a sandwich bag containing a single large piece of white compressed powder on the floor next to the bed. The deputies also recovered approximately two grams of green vegetable matter from the same location. Field tests revealed the presence of marijuana and cocaine. With their putative victim now a suspect in a drug investigation, the deputies placed Young under arrest, obtained her consent to continue searching her apartment, and retrieved $1200 in various denominations of currency. They also summoned members of the Narcotics Division to take over the investigation.
*337 Lieutenant Hoefeld, a member of the Jefferson Parish Sheriff's Office Narcotics Division, responded to the call. As the other officers on the scene briefed him on the investigation, respondent knocked at the door of the apartment. Hoefeld opened the door, informed respondent that he had stumbled onto a police investigation, and asked him to state his business. Respondent replied that he was there to see Ms. Young but that he thought he was at the wrong apartment. Hoefeld knew at the time from the other officers on the scene that Young had called respondent earlier and summoned him to the apartment. When he was asked about that call, respondent acknowledged that he had spoken to Young but continued to express uncertainty over whether he was at the right apartment. According to Lieutenant Hoefeld, respondent seemed "very surprised to see the police presence in the apartment and appeared to be visibly shaken by it." The officer asked respondent if he had any identification on him and respondent indicated that his identification was in his apartment which was also located in the Citrus Creek complex.
At this point in the investigation, Lieutenant Hoefeld decided to detain respondent and he placed him in handcuffs. The officer then asked respondent if he could accompany him to his apartment to obtain his identification. Respondent agreed and led Lieutenant Hoefeld and another deputy to his apartment where he provided the officers with a key to his door. When Hoefeld opened the door, the officers immediately detected a strong acidic chemical odor which they associated with cocaine. Hoefeld noticed that respondent's nervousness had increased and that he had begun shaking. The officer observed in the kitchen area to the immediate right of the doorway a large stack of currency on a table; he also noticed a smaller stack of currency on a table in the living room. The officer asked respondent about the money and chemical odor, and when Hoefeld received no response, he placed respondent under arrest and gave him his Miranda warnings.
Lieutenant Hoefeld then spotted a shopping bag on the floor of the kitchen and concluded it was the source of the heavy chemical odor permeating the apartment. When he peered into the partially opened bag the officer could see numerous sandwich baggies, a black scale and several loose plastic shopping bags. Asked by Hoefeld if he had any illegal drugs in the apartment or in the shopping bag, respondent this time acknowledged that there was "a large amount" of drugs in the bag, by which he meant, "enough to get me." However, respondent refused to give consent to a search of the bag. Lieutenant Hoefeld therefore got on the telephone and called in the results of his investigation. The information became the basis of the warrant application presented to the magistrate who then authorized a search of the apartment and the bag. Inside the bag the officers found a smaller, locked bank bag containing three plastic bags filled with cocaine, another bag containing marijuana, a digital scale, and four boxes of zip-lock bags in various sizes.
Lieutenant Hoefeld conceded during the suppression hearing that when he first encountered respondent he had no evidence connecting him with either the reported burglary or with the narcotics the other deputies had found in Ms. Young's apartment. However, the officer explained that defendant's nervous demeanor, hesitation about why he was at the doorway of Ms. Young's apartment, and his statement that he thought he was at the wrong apartment aroused his suspicion, as he knew that Ms. Young had summoned respondent over the telephone. Lieutenant Hoefeld further explained that he had then detained respondent *338 and placed him in handcuffs as the police attempted to confirm his identity "for our safety as well as his safety and the circumstances; not knowing exactly who was involved or who was not involved in the illegal narcotics that was found in the apartment."
In its written reasons for granting the motion to suppress, the trial court found that respondent's visible reaction to the officers' presence in Ms. Young's apartment "could be an appropriate reaction to a police investigation at a friend's apartment." The court further found that "without any other articulated activity, the police did not have the right to detain" respondent on reasonable suspicion supporting an investigatory stop under Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The court therefore concluded that Lieutenant Hoefeld's exploitation of that primary illegality derivatively tainted the warrant application's probable cause showing and required suppression of the evidence seized in respondent's apartment.
The trial court erred because it failed to accord due deference to the in-the-field judgment of Lieutenant Hoefeld conducting a fast-paced investigation in which the ostensible victim of a burglary had turned into a suspect in a narcotics investigation with its known attendant dangers, prompting the police to "exercise unquestioned command of the situation," Michigan v. Summers, 452 U.S. 692, 703, 101 S.Ct. 2587, 2594, 69 L.Ed.2d 340 (1981), while they determined the nature and scope of the criminal activity they had uncovered. The police were lawfully on the premises with the consent of Ms. Young when they discovered evidence not only of narcotics possession in plain view in the master bedroom of her apartment but also of narcotics trafficking in the large amount of cash in various denominations found elsewhere in the apartment. They had thus lawfully acquired probable cause to arrest her and the officers knew from Ms. Young that respondent's appearance at the door was not coincidental. Lieutenant Hoefeld did not immediately detain respondent but asked him pertinent questions which did not implicate the Fourth Amendment. Muehler v. Mena, 544 U.S. 93, 101, 125 S.Ct. 1465, 1471, 161 L.Ed.2d 299 (2005) ("We have `held repeatedly that mere police questioning does not constitute a seizure. [E]ven when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual; ask to examine the individual's identification; and request consent to search his or her luggage.' . . . Hence, the officers did not need reasonable suspicion to ask Mena for her name, date and place of birth, or immigration status.")(quoting Florida v. Bostick, 501 U.S. 429, 434-35, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991) and omitting citations); State v. Lewis, 00-3136, p. 3 (La.4/26/02), 815 So.2d 818, 820 ("An officer's request for identification does not turn the encounter into a forcible detention unless the request is accompanied by an unmistakable show of official authority indicating to the person that he or she is not free to leave.") (citations omitted).
It was only after respondent appeared to hesitate, in effect seeming to back away from the encounter by expressing confusion over whether he was at the correct apartment, that Lieutenant Hoefeld decided to detain respondent while they sorted out the matter of his identification. Given the rapidly changing nature of the police investigation and the uncertainty over where it was leading, respondent's shocked demeanor and hesitancy in acknowledging that he was where he thought he should be, Lieutenant Hoefeld had the requisite minimal objective basis to detain an individual *339 "in order to determine his identity or to maintain the status quo momentarily while obtaining more information," the hallmark of an investigatory stop. State v. Fauria, 393 So.2d 688, 690 (La.1981); see United States v. Sokolow, 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989)("The Fourth Amendment requires `some minimal level of objective justification' for making the stop. That level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence.")(internal citation omitted and quoting INS v. Delgado, 466 U.S. 210, 217, 104 S.Ct. 1758, 1763, 80 L.Ed.2d 247 (1984)).
However, even granting the reasonableness of Lieutenant Hoefeld's decision to detain respondent, the officer's use of handcuffs poses a separate question, as a search or seizure "reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity and scope." Terry, 392 U.S. at 18, 88 S.Ct. at 1878. Inherent in the right of the police to conduct a brief investigatory detention is also the right to use reasonable force to effectuate the detention. Mena, 544 U.S. at 99, 125 S.Ct. at 1470 ("`Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.'")(quoting Graham v. Connor, 490 U.S. 386, 396, 109 S.Ct. 1865, 1871-72, 104 L.Ed.2d 443 (1989)); United States v. Perdue, 8 F.3d 1455, 1462 (10th Cir. 1993)("Since police officers should not be required to take unnecessary risks in performing their duties, they are `authorized to take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of [a Terry ] stop.'")(quoting United States v. Hensley, 469 U.S. 221, 235, 105 S.Ct. 675, 683-84, 83 L.Ed.2d 604 (1985)).
Nevertheless, the use of handcuffs incrementally increases the degree of force used in detaining an individual. Mena, 544 U.S. at 99, 125 S.Ct. at 1470 ("The imposition of correctly applied handcuffs on Mena, who was already being lawfully detained during a search of the house, was undoubtedly a separate intrusion in addition to detention in the converted garage."); State v. Broussard, 00-3230, p. 4 (La.5/24/02), 816 So.2d 1284, 1287 ("`There is no question that the use of handcuffs, being one of the most recognizable indicia of a traditional arrest, substantially aggravates the intrusiveness of a putative Terry stop.'")(quoting United States v. Acosta-Colon, 157 F.3d 9, 18 (1st Cir.1998)(internal quotation marks omitted)). Thus, because the police conducting an investigatory stop "may not . . . seek to verify their suspicions by means that approach the conditions of arrest," Florida v. Royer, 460 U.S. 491, 499, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983), the use of handcuffs must appear objectively reasonable "in light of the facts and circumstances confronting [the police]," taking into account "the fact that police officers are often forced to make split-second judgmentsin circumstances that are tense, uncertain, and rapidly evolvingabout the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 397, 109 S.Ct. at 1872; Broussard, 00-3230 at 4, 816 So.2d at 1287 ("`Thus, when the government seeks to prove that an investigatory detention involving the use of handcuffs did not exceed the limits of a Terry stop, it must be able to point to some specific fact or circumstance that could have supported a reasonable belief that the use of such restraints was necessary to carry out the legitimate purpose of the stop without exposing law enforcement officers, the public, or the suspect himself to an undue risk of harm.'")(quoting Acosta-Colon, *340 157 F.3d at 18-19). If the added intrusion is not warranted under particular circumstances, a Terry stop may escalate into a de facto arrest requiring probable cause to render it valid. United States v. Melendez-Garcia, 28 F.3d 1046, 1053 (10th Cir.1994)("Because the specific nature of this stop [in which defendant was handcuffed and strapped into a police cruiser] was not justified under the Terry doctrine, we must treat it as an arrest, requiring probable cause."); Broussard, 00-3230, pp. 3-4, 816 So.2d at 1287 ("[B]revity alone does not always distinguish investigatory stops from arrests, as the former may be accompanied by arrest-like features, e.g., use of drawn weapons and handcuffs, which may, but do not invariably, render the seizure a de facto arrest.")(citing Acosta-Colon, 157 F.3d at 18-19)(emphasis added).
In the present case, although "[d]rugs and guns and violence often go together, and thus this might be a factor tending to support an officer's claim of reasonableness," Melendez-Garcia, 28 F.3d at 1052, Lieutenant Hoefeld did not articulate any particularized reason to believe that respondent was armed or violent. In fact, it appears that the officer did not subjectively believe that respondent posed an immediate safety risk as he made no mention at the suppression hearing that he first frisked respondent for weapons before accompanying him across the apartment complex. In the absence of such particularized concerns, ordinarily "the naked fact that drugs are suspected will not support a per se justification for use of guns and handcuffs in a Terry stop." Melendez-Garcia, 28 F.3d at 1053. The circumstances confronting Lieutenant Hoefeld thus did not compare to those in Mena, in which the police executed a warrant authorizing a search of the targeted premises for deadly weapons and evidence of gang membership during an investigation of a gang-related drive-by shooting. "In such inherently dangerous situations," a majority of the Court concluded, "the use of handcuffs minimizes the risk of harm to both officers and occupants," and in Mena's case, justified a detention in handcuffs lasting two or three hours to effectuate the government's "continuing safety interests." Mena, 544 U.S. at 100, 125 S.Ct. at 1470-71.
On the other hand, if the degree of perceived inherent danger in the present case does not compare to that in Mena, nor does the length of the detention of respondent in handcuffs, which lasted only for a presumably short walk from Young's apartment to respondent's and the few moments inside before Lieutenant Hoefeld detected the pervasive chemical odor, saw the stacks of currency, and peered into the partially opened bag stuffed with narcotics paraphernalia, and thereby acquired probable cause for a full-blown custodial arrest in which the use of handcuffs reflects no more than routine police procedure. Because he was attacking a facially valid warrant issued by a magistrate, respondent had the burden on the motion. La.C.Cr.P. art. 703(D). However, he presented no evidence at the hearing that the manner in which Lieutenant Hoefeld handcuffed him, either with his hands in front of him or behind his back, caused "real pain or serious discomfort," Mena, 544 U.S. at 100, 125 S.Ct. at 1472 (Kennedy, J., concurring), sufficient to render the continued use of handcuffs until the investigation culminated in his arrest moments later unreasonable even if justified at the outset. In addition, the initial detention of respondent lacked other indicia of a de facto arrest. The officers did not place him in a patrol unit, Melendez-Garcia, 28 F.3d at 1050, or otherwise relocate him from the scene to a more secure area. Acosta-Colon, 157 F.3d at 12 (defendant relocated from jetway to customs inspection area); cf. Dunaway v. New York, 442 U.S. 200, 99 S.Ct. 2248, 60 *341 L.Ed.2d 824 (1979)(relocation of suspect from home to station house for investigative questioning). Instead, they escorted him from the secured area of Young's apartment to a completely unsecured area, i.e., his own apartment in the same complex, under uncertain circumstances for purposes of confirming his identity. Despite some concerns about the objective reasonableness of Lieutenant Hoefeld's conduct, given the brevity of respondent's detention in handcuffs before he was lawfully arrested, and the changing nature of the police investigation which had begun to focus on a possible link of respondent and Young to narcotics trafficking, and giving due deference to the decisions made in the field by police officers under the press of "tense, uncertain, and rapidly evolving" circumstances, Graham, 490 U.S. at 397, 109 S.Ct. at 1872, we cannot say that Lieutenant Hoefeld's conduct in securing relator's hands to minimize any risk entailed by entering his apartment for his identification escalated the Terry stop into a de facto arrest unsupported by probable cause.
Accordingly, we find that respondent's consent to the search of his apartment by Lieutenant Hoefeld was not tainted by any prior illegal conduct of the police and that the police came at the probable cause basis for the continued search of the apartment and the tell-tale bag by lawful means. The trial court's judgment granting respondent's motion to suppress is therefore vacated, the motion is denied, and this case is remanded to the district court for further proceedings consistent with the views expressed herein.
TRIAL COURT'S RULING REVERSED; MOTION TO SUPPRESS DENIED; CASE REMANDED.