PER CURIAM.
 
 [1]
 

 11 Charged by bill of information with possession of a Schedule III controlled substance with intent to distribute in violation of La.R.S. 40:968(A), defendant moved to suppress the evidence, 56 pills of Lortab, seized by the police on June 6, 2007. After a hearing conducted on October 24, 2007, the trial court denied the motion with written reasons. Defendant sought review in the Third Circuit, which granted his writ and overturned the ruling of the trial court.
 
 State v. Palmer,
 
 08-0621 (La.App. 3rd Cir.12/10/08), 1 So.3rd 689. We granted the state’s writ of review to consider the court of appeal’s decision and now reverse because we fully subscribe to the views of the trial court that the police acted reasonably under the circumstances in detaining and handcuffing defendant among several other individuals during an investigation conducted on the premises of a residence long the subject of citizen complaints about ongoing drug trafficking.
 

 12Those citizen complaints culminated in the events of June 6, 2007, when the Natchitoches Drug Task Force received three more calls regarding apparent drug trafficking from 210 Shoreline Drive in Bossier, Louisiana. One caller reported that within half an hour, 16 vehicles had visited the address but stayed only for seconds. According to Sergeant Henson, similar calls on numerous prior occasions had prompted the Task Force approximately one month before to arrange a controlled purchase of a small amount of methamphetamine from the residence by one of its confidential informants.
 

 The controlled buy evidently did not lead to immediate action but after receiving the third call on June 6, Sergeant Henson, accompanied by other members of the Task Force, including Detective Glen Sers from the Natchitoches Parish Sheriffs Office, drove to the residence accompanied by members of the Sheriffs Office Criminal Patrol Division. As the squadron approached, they observed several individuals spill out of the residence and walk quickly towards vehicles parked on the
 
 *306
 
 premises. The officers also spotted two individuals emerge from the back door of the residence at a dead run. As other officers pursued the two fleeing men and eventually caught them several houses away, Sergeant Henson approached the open front door of the residence, knocked, and then walked inside where he encountered the occupant, Crystal Swan. The sergeant asked for and received Swan’s consent to a search of the residence. At that time, Sergeant Henson also notified the other officers on the scene to detain everyone else on the premises. The ensuing search of the home revealed a “significant amount” of marijuana, a small amount of methamphetamine, narcotics paraphernalia, and “long guns,” presumably rifles.
 

 As the search proceeded, the other officers rounded up all of the individuals still on the scene, handcuffed them, and herded them into a circle under the watch of [3two of the agents. Defendant was in the group with his hands cuffed behind his back. He had been detained initially by Detective Sers, who stopped him on the porch at the rear of the residence, frisked him, and then cuffed him, although he had detected no weapons, “until we could identify him.... We wasn’t gonna turn him loose to go ... and he might have had a warrant or anything else on him.” Sers also asked for and obtained defendant’s consent to search his vehicle on a printed form after releasing the cuffs momentarily. According to the detective, after the officers “found some stuff inside the house” they “wanted to check the vehicles to make sure nothing additional [was] in the vehicles.” Detective Sers then found the 56 Lortab pills in the glove compartment of defendant’s vehicle, placed defendant under arrest, searched him, and retrieved $450 in cash.
 

 Sergeant Henson estimated that 18 or 14 individuals had been present on the scene when the Task Force arrived. He explained that the officers used handcuffs in detaining the individuals “due to the amount of people that was there, the amount of traffic that had been informed to us.” According to Detective Sers, the cuffs came out “for detainment .... people were leaving the residence ... there were more people there than there were officers almost....” The detective added that, given the reports of drug activity at the residence, the number of people rushing out of the doors of the residence underscored the need to detain them safely, as “drugs and weapons coincide a whole lot.”
 

 In its reasons denying the motion to suppress, the trial court found that the Supreme Court’s decision in
 
 Muehler v. Mena,
 
 544 U.S. 93, 125 S.Ct. 1465, 161 L.Ed.2d 299 (2005), and this Court’s opinion in
 
 State v. Porche,
 
 06-0312 (La.11/29/06), 943 So.2d 335, governed the present case, as the need of the police to exercise unquestioned command in an extremely fluid situation, in which numerous ^persons were pouring out of the residence and scattering at the approach of the officers, justified detention of all persons on the scene temporarily to maintain the status quo as the police investigated the reports of ongoing drug activity. In the court’s view, the fluid and uncertain situation further justified the incremental intensification of the detentions caused by the use of handcuffs. The court thereby gave “due deference” to the officers’ decisions made on the scene to ensure their safety in uncertain and changing circumstances. Given that premise, the trial court concluded that defendant’s consent to the search of his car, leading to the recovery of the Lortab pills, was not the product of any prior illegal conduct by the police.
 

 
 *307
 
 Disagreeing with that conclusion, the Third Circuit found that the officers in the Task Force “had nothing more than suspicion of criminal activity based upon information from unidentified ‘citizen’ callers who had only observed cars coming and going for brief periods of time from the residence.... Absolutely no evidence was presented to show that Mr. Palmer was committing, had committed or was about to commit some criminal offense. Mr. Palmer was merely seen walking out of a residence in which unknown citizens suspected drug activity.”
 
 Palmer,
 
 08-0621 at 8, 1 So.3d at 695. In addition, the court of appeal found that “[t]he only fact or circumstance ... articulated in this case as the reason for immediately handcuffing and frisking defendant Palmer and others,”
 
 ie.,
 
 that “the police were outnumbered and had concern for their safety,” did not adequately justify handcuffing the defendant because “the State witnesses did not articulate any particularized reason for believing defendant Palmer was armed or violent.”
 
 Id.
 
 08-0621 at 9, 1 So.3d at 696. Thus, the court of appeal reasoned, “[e]ven if the ‘safety’ of the officers suffices as a legitimate basis for initially stopping defendant and conducting a pat down of his person for weapons, we are satisfied the continued detention and handcuffing of |defendant by the officers far exceeded the permissible limits of an investigatory stop or detention for this purpose.”
 
 Id.
 
 08-0621 at 10, 1 So.3d at 696. The only other reason articulated by Sergeant Henson, that he needed to determine whether defendant had any outstanding warrants, did not, in the view of the court of appeal, justify that continued detention based “on nothing more than suspicion with the articulated intent of the police to hold him and restrict his freedom until they could determine whether there was any warrant for his arrest outstanding or whether they could somehow connect him to any illegal activity after searching his case.”
 
 Id.
 
 The court of appeal thus concluded that given the circumstances of the encounter which resembled more a
 
 de facto
 
 arrest than a brief investigatory detention, defendant’s consent to the search of his vehicle “was tainted by the illegal conduct of the police in handcuffing and continuing to detain him without probable cause.”
 
 Id.
 
 08-0621 at 11,1 So.3d at 697.
 

 However, the court of appeal erred by substantially understating the circumstances confronting the Task Force members as they approached the residence and thereby failing to accord due deference to the trial court’s factual findings.
 
 State v. Hampton,
 
 98-0331, p. 12 (La.4/23/99), 750 So.2d 867, 884 (“As a general rule, deferential standards of review apply to factual and other trial determinations, while determinations of law are subject to
 
 de novo
 
 review.”);
 
 cf. Ornelas v. United States,
 
 517 U.S. 690, 699, 116 S.Ct. 1657, 1663, 134 L.Ed.2d 911 (1996)(While “as a general matter determinations of reasonable suspicion and probable cause should be reviewed
 
 de novo
 
 on appeal .... a reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers.”). In the present case, the officers did not “merely” observe defendant walking out of a | (¡residence in which unidentified citizens suspected drug-activity. In fact, as the trial court found on the basis of Sergeant Henson’s testimony, the officers observed several persons emerge from the front of the home and walk “very quickly” towards vehicles parked on the scene. They also observed two other individuals sprint away from the back door. The trial court specifically found that the activity had been prompted by the arrival of the officers on the scene.
 

 
 *308
 
 In all, according to Sergeant Henson, the officers observed 13 or 14 people on the premises shortly after the police received information from the unidentified concerned citizens which conveyed not simply unparticularized suspicions but also a factual report of unusually heavy vehicular traffic over a short period of time involving stops of extremely brief duration suggestive of ongoing drug trafficking.
 
 See, e.g., United States v. Hernandez Leon,
 
 379 F.3d 1024, 1027-28 (8th Cir.2004)(“The redacted affidavit includes reference to the citizen reports about suspected drug trafficking at the address and [the officer’s] observations of heavy foot and vehicle traffic there, involving short visits during all hours of the night.... They obtained entry into the house by consent and discovered marijuana and a drug pipe inside it ... corroborating] the citizen reports of suspected drug trafficking.”). That specific factual information, although from an unidentified citizen source, appeared entirely consistent with what the police knew from their own experience gained when their confidential informant made a purchase of methamphetamine from the residence a month earlier and with what the officers then observed as they approached the residence and various individuals responded by scattering from the premises. Under the totality of the circumstances, the police had an objective and apparently reliable basis for suspecting renewed or ongoing drug trafficking at the residence,
 
 i.e.,
 
 the 'requisite minimal level of objective justification for an investigatory detention of all 17of the individuals on the scene to take unquestioned command of the situation and to maintain the status quo temporarily while the investigation continued.
 
 Ornelas,
 
 517 U.S. at 695-96, 116 S.Ct. at 1661 (“Articulating precisely what ‘reasonable suspicion’ and ‘probable cause’ mean is not possible. They are eommonsense, non-technical conceptions that deal with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.... We have described reasonable suspicion simply as a particularized and objective basis for suspecting the person stopped of criminal activity.... [Reasonable suspicion and probable cause] are fluid concepts that take their substantive content from the particular contexts in which the standards are being assessed.”)(internal quotation marks and citations omitted);
 
 cf. Illinois v. Wardlow,
 
 528 U.S. 119, 124, 120 S.Ct. 673, 676, 145 L.Ed.2d 570 (2000)(“Headlong flight— whenever it occurs — is the consummate act of evasion. It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such.”);
 
 State v. Williams,
 
 421 So.2d 874, 877 (La.1982)(“[G]iven the sudden departure of the trio [of men] at the approach of the police, given the furtive gesture of one of them and the coincident attempt at departure by defendant in his vehicle, the officers’ hunch had flowered into reasonable suspicion, based on articu-lable facts.... At that point the officers were entitled to demánd of defendant ‘his name, address and explanation of his actions.’ ”)(citing La.C.Cr.P. art. 215.1).
 
 [2]
 

 
 *309
 
 | Jn addition, while an otherwise lawful detention or seizure “reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity and scope,”
 
 Terry v. Ohio,
 
 392 U.S. 1, 18, 88 S.Ct. 1868, 1878, 20 L.Ed.2d 889 (1968), the trial court properly found in the present case that the tactics employed by the Task Force members after they entered the premises, herding the 13 or 14 individuals together and handcuffing them under the watch of two of the officers while the search of the home proceeded with the consent of the occupant, resembled the tactics employed by the police in
 
 Mena,
 
 in which the members of the SWAT team executing a search warrant gathered Mena and three other occupants found on the premises together in handcuffs, herded them into a converted garage, and held them there under the watch of two officers as the search of the main house proceeded over the course of two or three hours. In sanctioning those tactics, the Supreme Court emphasized the high-risk nature of the investigation.
 
 Mena,
 
 544 U.S. at 100, 125 S.Ct. at 1470-71 (“[T]his was no ordinary search. The governmental interests in not only detaining, but using handcuffs, are at their maximum when, as here, a warrant authorizes a search for weapons and a wanted gang member resides on the premises.”). However, the Court also noted that “[t]hough this safety risk inherent in executing a search |9warrant for weapons was sufficient to justify the use of handcuffs, the need to detain multiple occupants made the use of handcuffs all the more reasonable.”
 
 Id.,
 
 544 U.S. at 100, 125 S.Ct. at 1471 (citing
 
 Maryland, v. Wilson,
 
 519 U.S. 408, 414, 117 S.Ct. 882, 886, 137 L.Ed.2d 41 (1997))(“[D]anger to an officer from a traffic stop is likely to be greater when there are passengers in addition to the driver in the stopped car.”). Thus, the nature of the investigation combined with the number of persons detained constituted the particularized circumstances which justified handcuffing all four occupants in
 
 Mena,
 
 although there was no particularized showing that Mena herself or any of the other individuals on the premises posed a specific threat to officer safety. In fact, the police found Mena asleep in her bed and led her barefoot in nightclothes out of the house to the garage with the other occupants.
 
 Mena,
 
 544 U.S. at 107, 125 S.Ct. at 1475 (Stevens, J., concurring). The eight-member SWAT team also had them outnumbered by a factor of two to one.
 
 Id.
 

 The present case did not pose the same level of risk to officer safety as in
 
 *310
 

 Mena.
 
 We have cautioned that the well-known association of drugs and firearms does not invariably justify the use of handcuffs in detaining persons short of formal arrest, as each case must turn on its particular circumstances.
 
 Porche,
 
 06-0312 at 9, 943 So.2d at 340 (“In the absence of such particularized concerns, ordinarily the naked fact that drugs are suspected will not support a per se justification for use of guns and handcuffs in a
 
 Terry
 
 stop.”)(internal quotation marks and citation omitted). On the other hand, the Task Force officers did find drugs and some firearms in the house and they faced a distinct problem of crowd control. Although the record is unclear as to the number of officers involved, and it appears possible the officers arrived in numbers roughly comparable to the number of persons they found on the premises, or only slightly less, we agree with the trial court that the officers’ use of|10handcuffs to detain defendant along with the other individuals on the premises was “objectively reasonable in ‘light of the facts and circumstances confronting [the police], taking into account ‘the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation.’”
 
 Porche,
 
 06-0312 at 8, 943 So.2d at 339 (quoting
 
 Graham v. Connor,
 
 490 U.S. 386, 397, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989)). We further agree that the effort to identify defendant and to seek his consent to a search of his car after contraband was discovered inside the residence and the citizen tips were confirmed did not unduly prolong the encounter, as a brief detention “ ‘in order to determine [an individual’s] identity or to maintain the status quo momentarily while obtaining more information,’ [is] the hallmark of an investigatory stop.”
 
 Porche,
 
 06-0312 at 6, 943 So.2d at 339 (quoting
 
 State v. Fauria,
 
 393 So.2d 688, 690 (La.1981)).
 
 Cf. Mena,
 
 544 U.S. at 101, 125 S.Ct. at 1471 (questions asked by police during lawful detention of an individual do not constitute an additional seizure within the meaning of the Fourth Amendment because “ ‘[e]ven when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual; ask to examine the individual’s identification; and request consent to search his or her luggage.’ ’’(quoting
 
 Florida v. Bostick,
 
 501 U.S. 429, 434-35, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991)).
 
 [3]
 

 
 *311
 
 111 Accordingly, the decision of the Third Circuit is reversed, the ruling of the trial court denying the motion to suppress is reinstated, and this case is remanded to the district court for further proceedings consistent with the views expressed herein.
 

 DECISION OF COURT OF APPEAL REVERSED; TRIAL COURT’S DENIAL OF MOTION TO SUPPRESS REINSTATED; CASE REMANDED.
 

 JOHNSON, J., concurs.
 

 [1]
 

 . Retired Judge Philip Ciaccio, assigned as Justice
 
 ad hoc,
 
 sitting for Justice Chet D. Traylor, now retired.
 

 [2]
 

 . Defendant argues that apart from the question of whether the police had reasonable suspicion to detain him, the seizure, which occurred on private property, exceeded the scope of La.C.Cr.P. art. 215.1(A), which authorizes investigatory stops in a "public place." However, for purposes of the Fourth Amendment, the distinction is not between public and private property but between pub-lie and private places, and when an individual steps across the threshold of a home he enters a public place and subject to seizure by the police acting upon probable cause for an arrest or reasonable suspicion for an investigatory stop. Thus, in
 
 United States v. Santana,
 
 427 U.S. 38, 42, 96 S.Ct. 2406, 2409, 49 L.Ed.2d 300 (1976), the Supreme Court held that the defendant could not forestall her ar
 
 *309
 
 rest, which began when she was standing in the doorway of her home, simply by stepping back across the threshold into the vestibule of the home. The Court observed:
 

 While it may be true that under the common law of property the threshold of one’s dwelling is 'private,' as is the yard surrounding the house, it is nonetheless clear that under the cases interpreting the Fourth Amendment Santana was in a 'public' place. She was not in an area where she had any expectation of privacy. "What a person knowingly exposes to the public, even in his own house or office, is not a subject of Fourth Amendment protection."
 
 Katz
 
 v.
 
 United States,
 
 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967). She was not merely visible to the public but was a exposed to public view, speech, hearing, and touch as if she had been standing completely outside her house.
 
 Hester v. United States,
 
 265 U.S. 57, 59, 44 S.Ct. 445, 446, 68 L.Ed. 898 (1924). Thus, when the police, who concededly had probable cause to do so, sought to arrest her, they merely intended to perform a function which we have approved in [U.S. v.]
 
 Watson[,
 
 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976)].
 

 Santana,
 
 427 U.S. at 42, 96 S.Ct. at 2409.
 

 We have no reason to suppose that when it used the specific language "public place” in La.C.Cr.P. art. 215.1(A), the legislature meant to circumscribe the scope investigatory stops in Louisiana more narrowly than what the Fourth Amendment permits as reasonable.
 

 [3]
 

 . Defendant argues that before obtaining his signature on the consent form the officers did not comply with La. Const, art. I, § 13, which provides that "[wjhen any person has been arrested
 
 or detained
 
 in connection with the investigation or commission of any offense, he shall be advised fully of the reason for his arrest or detention, his right to remain silent, his right against self-incrimination, his right to the assistance of counsel and, if indigent, his right to court appointed counsel." (emphasis added).
 
 See also
 
 La.C.Cr.P. art. 218.1(same). This Court has observed that in Art. I, § 13 the framers "intended to adopt the
 
 Miranda [v. Arizona,
 
 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)] edicts full-blown and unfettered.... The use of ‘detained’ in addition to ‘arrested’ was intended to prevent a narrow construction of the latter term."
 
 State in Interest of Dino,
 
 359 So.2d 586, 590 (La.1978). In defendant's view, the absence of
 
 Miranda
 
 warnings tainted his consent and thereby required suppression of the evidence derived from that consent.
 

 We need not revisit here the question of whether Art. I, § 13 was intended to apply more broadly in the context of investigatory stops in which the person is "detained” but not "arrested," because defendant's consent to the search of his vehicle is a non-communicative and non-testimonial statement falling completely outside of the Fifth Amendment and therefore outside of the
 
 Miranda
 
 protections incorporated in Art. I, § 13 and La.C.Cr.P. art. 218.1.
 
 See United States v. Bustamante,
 
 493 F.3d 879, 892 (7th Cir.2007)("[A] statement granting 'consent to search ... is neither testimonial nor communicative in the
 
 *311
 
 Fifth Amendment sense.’ "(quoting Wayne R. LaFave, Jerold H. Isreal, & Nancy J. King,
 
 Criminal Procedure
 
 § 3.10(b)(2d ed.2007));
 
 United States v. Rodriguez-Garcia,
 
 983 F.2d 1563, 1568 (10th Cir.1993)("Every federal circuit court which has addressed the
 
 Miranda
 
 issue ... has reached the conclusion that a consent to search is not an incriminating statement.... Consenting to a search is not 'evidence of a testimonial or communicative nature’ which would require officers to first present a
 
 Miranda
 
 warning.”). Thus, the failure of the police to advise defendant of his
 
 Miranda
 
 rights did not taint his otherwise voluntary consent to the search of his vehicle by signing a form which, according to the testimony at the hearing on the motion to suppress, specifically advised him that he could withhold his consent to the search.
 
 Cf. Schneckloth v. Bustamonte,
 
 412 U.S. 218, 225-26, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973)(test of voluntary consent under the Fourth Amendment does not rely on a waiver of a known right or privilege,
 
 e.g.,
 
 the right to refuse consent, but takes into account the totality of all of the circumstances in determining whether the consent was a product of an individual’s “ 'free and unconstrained choice,' ” or of police duress and coercion.) (quoting
 
 Culombe v. Connecticut,
 
 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961)).