## STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 14-127

STATE OF LOUISIANA

VERSUS

WENDELL PRICE

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF ACADIA, NO. 79587
HONORABLE JOHN D. TRAHAN, DISTRICT JUDGE

**********

## ELIZABETH A. PICKETT
## JUDGE

**********

Court composed of Jimmie C. Peters, Marc T. Amy, and Elizabeth A. Pickett, Judges.

**AFFIRMED.**

**Michael Harson**
**District Attorney, Fifteenth Judicial District Court**
**Frederick L. Welter**
**Assistant District Attorney**
**P.O. Box 3306**
**Lafayette, LA 70502-3306**
**(337) 232-5170**
**COUNSEL FOR PLAINTIFF-APPELLEE:**
     **State of Louisiana**

**Harold D. Register, Jr.**
**Attorney at Law**
**P. O. Box 80214**
**Lafayette, LA 70598-0214**
**(337) 981-6644**
**COUNSEL FOR DEFENDANT-APPELLANT:**
     **Wendell Price**

**PICKETT, Judge.**

<u>FACTS</u>

On April 2, 2012, Officer Joseph Cormier of the Rayne Police Department was working a speed enforcement detail on the north side of the railroad tracks in Rayne when a vehicle approached him. "[T]he driver was very frantic, stating that her boyfriend had just been brutally beaten by three black males, and they had a tan dog with them." The passenger had a face full of blood with a "bent, possibly broken" nose, and he appeared to be in a lot of pain. The driver and passenger reported the incident occurred on Live Oak. One of the three black men was wearing a red shirt, and another was a large man wearing a white shirt. Officer Cormier sent them to the police department and dispatched an ambulance to meet them. He then began a patrol to look for the suspects.

On Live Oak, Officer Cormier first saw a black man wearing a red shirt. He spoke to the man, obtained his personal information, and "told him to be on his way." He looked down the street and saw a tan dog in the roadway. He followed it, and it went into the defendant's yard. The defendant, "a large, black male wearing a white t-shirt," was standing in the driveway.

The tan dog, a Chinese Char-Pei and Rottweiler mix, and two other dogs, a Chinese Char-Pei and a Rottweiler, were in the yard. When Officer Cormier asked the defendant to put his dogs away, the defendant refused. By then, Officer Joseph Credeur had arrived, but he remained inside his vehicle. An altercation ensued in which Officer Cormier hit the defendant in the head with his baton. Ultimately, Officer Credeur ended the altercation by using his Taser on the defendant, who was then arrested.

The defendant, Wendell Price, was charged with resisting an officer with force, a violation of La.R.S. 14:108.2, and battery of a police officer, a violation of La.R.S. 14:34.2, on August 16, 2012. The trial court severed the counts, and a jury found the defendant guilty of the lesser charge of resisting an officer, a violation of La.R.S. 14:108, on October 23, 2013. The trial court sentenced the defendant to serve a suspended sentence of six months in the parish jail. The trial court also placed the defendant on six months of misdemeanor probation with the special conditions of paying a $250.00 fine and $227.50 in court costs and completing an anger management program.

The defendant now appeals his conviction.

## ASSIGNMENTS OF ERROR

1. The trial court erred in its determination that Officer Joseph Cormier and Officer Joseph Credeur provided credible testimony although there were several blaring [sic] internal contradictions and irreconcilable conflicts within their respective testimonies.

2. The trial court erred in failing to find that the State proved beyond a reasonable doubt that Wendell Price was resisting an unlawful arrest when Officer Joseph Cormier began to violently strike Price to effect the unlawful arrest.

3. The trial court erred in failing to consider Rayne Ordinance Sec. 18-2 when Wendell Price's dogs were in his yard on private property.

4. The trial court erred in failing to consider that there was no probable cause to arrest Wendell Price when Price was merely outside speaking on the phone watching his well-trained dogs urinate and thus became the subject of a violent tirade by Officer Joseph Cormier.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by this court for errors patent on the face of the record. After reviewing the record, we find one error patent.

The record before this court does not indicate that the trial court advised the defendant of the prescriptive period for filing post-conviction relief as required by La.Code Crim.P. art. 930.8. Thus, the trial court is directed to inform the defendant of the provisions of Article 930.8 by sending appropriate written notice to the defendant within ten days of the rendition of this opinion and to file written proof in the record that the defendant received the notice. *State v. Roe*, 05-116 (La.App. 3 Cir. 6/1/05), 903 So.2d 1265, *writ denied*, 05-1762 (La. 2/10/06), 924 So.2d 163.

## ASSIGNMENTS OF ERROR NUMBERS ONE AND TWO

The defendant's first two assignments of error allege the evidence was insufficient to convict him. First, the defendant argues the trial court erred in its determination that Officers Cormier and Credeur provided credible testimony in light of "several blaring [sic] internal contradictions and irreconcilable conflicts within their respective testimonies [sic] [.]" Next, the defendant contends the trial court erred in failing to find he was resisting an unlawful arrest when Officer Cormier "began to violently strike [him] to effect the unlawful arrest[.]"

The standard of review in a sufficiency of the evidence claim is "whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged." *State v. Leger*, 05-11, p. 91 (La. 7/10/06), 936 So.2d 108, 170, *cert. denied*, 549 U.S. 1221, 127 S.Ct. 1279 (2007) (citing *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979); *State v. Captville*, 448 So.2d 676, 678 (La.1984)). The *Jackson* standard of review is now legislatively embodied in La.Code Crim.P. art. 821. It does not allow the appellate court "to substitute its own appreciation of the evidence for that of the fact-finder." *State v. Pigford*, 05-477, p. 6 (La. 2/22/06), 922 So.2d 517, 521 (citing *State v. Robertson*,

3

96-1048 (La. 10/4/96), 680 So.2d 1165; *State v. Lubrano*, 563 So.2d 847, 850 (La.1990)). The appellate court's function is not to assess the credibility of witnesses or to reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So.2d 442.

The factfinder's role is to weigh the credibility of witnesses. *State v. Ryan*, 07-504 (La.App. 3 Cir. 11/7/07), 969 So.2d 1268. Thus, other than insuring the sufficiency evaluation standard of *Jackson*, "the appellate court should not second-guess the credibility determination of the trier of fact," but rather, it should defer to the rational credibility and evidentiary determinations of the jury. *Id.* at 1270 (quoting *State v. Lambert*, 97-64, p. 5 (La.App. 3 Cir. 9/30/98), 720 So.2d 724, 727). Our supreme court has stated:

> However, an appellate court may impinge on the fact finder's discretion and its role in determining the credibility of witnesses "only to the extent necessary to guarantee the fundamental due process of law." *State v. Mussall,* 523 So.2d 1305, 1310 (La.1988). In determining the sufficiency of the evidence supporting a conviction, an appellate court must preserve "'the factfinder's role as weigher of the evidence' by reviewing 'all of the evidence . . . in the light most favorable to the prosecution.'" *McDaniel v. Brown,* 558 U.S. [120, 134], 130 S.Ct. 665, 674, 175 L.Ed.2d 582 (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). When so viewed by an appellate court, the relevant question is whether, on the evidence presented at trial, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789. Applied in cases relying on circumstantial evidence, . . . this fundamental principle of review means that when a jury "reasonably rejects the hypothesis of innocence presented by the defendant[ ], that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt." *State v. Captville,* 448 So.2d 676, 680 (La.1984).

*State v. Strother*, 09-2357, pp. 10-11 (La. 10/22/10), 49 So.3d 372, 378 (third alteration in original).

4

Officer Cormier testified he pulled into the defendant's driveway and asked him to put the three large dogs away for safety purposes so he could talk to him. The defendant first walked toward his house but then "came back and started cursing, saying he's not putting his dogs away." Officer Cormier told the defendant he would place him under arrest if he did not put his dogs away. The defendant refused, saying the dogs "were just using the restroom."

When Officer Cormier told the defendant he had "one last chance" to put the dogs away or be placed under arrest," the defendant responded, "I'm not putting my dogs away. Get the F off my property. You don't belong here, and I'm not being arrested." Officer Cormier told the defendant he was placing him under arrest. When he "went to grab [the defendant's] hand and put a cuff on it, he pulled back and hit me in the jaw with his left hand." Officer Cormier tried again, and he and the defendant "wrestled for a second." The defendant then put Officer Cormier in "a chokehold, a C-grip chokehold."

At that point, Officer Cormier pulled out an expandable baton and pushed the defendant away. The defendant ran toward his house with Officer Cormier in pursuit. They fought some, and the defendant got Officer Cormier into another C-grip, which he described as "when you grab someone by the neck . . . and you're squeezing, and you're trying to choke them . . . There's a lot of things that can be damaged in here which would cause a lot of turmoil and suffocation." The defendant and Officer Cormier were pinned between the house and the car, where Officer Cormier had no room to push the defendant back. He continuously struck the defendant. Officer Cormier testified he "was in fear of [his] life." He said he considered pulling his weapon and shooting the defendant "so that at least [he] could survive and go home," but he refrained. He knew he would pass out, be

severely hurt, or possibly die if he could not get out of the chokehold. Officer Credeur then used a Taser on the defendant that released the hold he had on Officer Cormier. The officers cuffed the defendant, escorted him to their vehicle, and transported him.

Officer Cormier was "investigating a crime, a very serious, felony, heinous crime where three persons committed a second degree battery, and [the defendant] was a possible suspect." He believed the defendant could have been arrested simply for having one of his dogs in the street without a leash. Officer Cormier at first sought only to gather information, but when the defendant refused his lawful commands, he "commenced to placing him under arrest." At the point the defendant struck Officer Cormier, he committed battery on an officer, creating another reason to arrest him.

Officer Cormier did not seek medical attention or take any pictures of his face after the incident. He said he did not know if the defendant was ever questioned about the original crime that led him to the residence.

Officer Cormier never told the defendant he was a suspect in a crime; he explained, however, this was because he never had the opportunity to talk to the defendant as he intended because the defendant refused to put up the dogs. The dogs were "still running around and . . . leaving the yard and being on the road" when the defendant was arrested and transported to the police station.

Officer Credeur testified that he received Officer Cormier's call on April 2, 2012, that a severely injured subject had approached him. Officer Cormier reported the incident "possibly occurred around the Live Oak area with three males with a large dog with them." One wore a red shirt, and one wore a white shirt.

Officer Credeur and Sergeant Chris Cormier went to the area and began canvassing it.

When Officer Credeur heard Officer Cormier advise over the radio he was going to speak with a suspect at the corner of Live Oak and Perrodin, he went to meet him and parked in the driveway behind him. Officer Cormier approached Officer Credeur's vehicle and said he was going to advise the defendant to put up his dogs or face arrest. The dogs were in the defendant's yard when Officer Credeur arrived. Officer Credeur saw the defendant walking toward the residence.

Officer Credeur testified that he stayed inside his vehicle and began checking his phone for information about another case from earlier that day. He looked up "when [he] heard a commotion occur." He saw Officer Cormier and the defendant "underneath the carport area next to the rear – the back door and the car." Although they were "tussling," they were not throwing punches. Officer Credeur approached to break up the conflict and saw the defendant "had [Officer Cormier] in a C-grip chokehold with the left arm." Officer Cormier's feet were two to three inches off the ground. Officer Credeur said he could see daylight between Officer Cormier's shoes and the driveway. Officer Credeur was unable to break up the conflict, and Officer Cormier was swinging his baton "to try to break the grip any way possible." Officer Credeur "pulled [his] X26 Taser" and used the drive-stun on the defendant's armpit, which tases only the immediate area, not the entire body. The defendant swung his arm, and the Taser hit him again. Officer Credeur continued to tell the defendant to stop. When he finally did, Officer Credeur told the defendant Officer Cormier was going to place him under arrest.

By the time Officer Credeur used the Taser, Officer Cormier's "swinging was slowing down as if he was losing breath as in strength." He said he was concerned for Officer Cormier's life. He heard none of the conversation between Officer Cormier and the defendant, and he did not see the defendant hit Officer Cormier. In the meantime, Kyestle Thomas, the mother of two of the defendant's children, had come outside and was holding a baby. During the incident, Officer Credeur had to move her out of the way to get to Officer Cormier and the defendant. Although Officer Credeur noticed people standing across the street from the defendant's house, he testified they would not have been able to see the corner of the carport and the door to the defendant's residence where the incident occurred.

The defendant and his witnesses told a different version of the incident at trial. Kaiia Archangel said she was walking to her mother's house across the street from the defendant's house on the day of the incident. She saw dogs running in the defendant's yard when a Rayne police vehicle pulled up, and the officer hollered, "Put the f_ _ _ _ing dog up." The defendant asked, "What's the problem," and the officer said they were looking for a dog. Officer Cormier told the defendant, "Sir, I said for you to put the f-ing dogs up. Put the dogs up now." He then told the defendant he was going to arrest him if he did not put the dogs away. Ms. Archangel saw the officer try to grab the defendant and "hit him with the stick" when the defendant tried to get away. Ms. Archangel admitted she may not have heard the first exchange between Officer Cormier and the defendant. She never saw the defendant take a swing at Officer Cormier or make any aggressive moves toward him, and she never saw the defendant "put a headlock" on him. Ms.

Archangel specifically recalled seeing the defendant's father and brother at the scene. They did not testify at trial.

Ms. Archangel testified the first statement she gave police on April 3, 2012, "was screwed up from jump." Even though she signed the statement, she "didn't really read it" and "really didn't understand it." She told her son "what [she] wanted to be said. He rewrote her statement, she "typed it up," and she had it notarized on April 27, 2012, because the defendant "wanted it be right[.]" The main difference between the two statements was the language Ms. Archangel said Officer Cormier used. The first statement showed him politely saying "[s]ir, put [t]he dogs up," while the second statement said the first thing he said to the defendant was "[p]ut your f_ _ _ing dogs up" when he arrived.

When Ms, Archangel testified before the grand jury, she testified Officer Cormier might have asked the defendant to put his dogs up "in a nice way," when he first approached him. The defendant "probably said, 'No,' and he probably p_ _ _ed [Officer Cormier] off." At trial, she admitted she was "not remembering everything . . . that probably happened that day." However, she swore her second statement was the truth. When asked whether Officer Cormier could have been very courteous and professional in his first exchange with the defendant, Ms. Archangel responded, "I can't answer that. I don't know that." She then admitted she "probably didn't" hear the first exchange.

Ms. Archangel also gave contradictory and confusing testimony about her reading ability. Her second statement, signed before the notary, stated she could not read. She testified she lacked the ability to read the first statement she gave on April 3, 2012. However, she testified she attended school through the eleventh grade. She testified she also attended classes to become a certified nursing

assistant for "maybe a month"; sometimes she studied, sometimes she did not. She later worked at Wendy's as a cashier, operating a computer and making change. Ms. Archangel completed her own applications when she applied for jobs. She reviewed the first statement and determined "it was screwed up. It wasn't right." Her son then rewrote the statement, and she "typed it up."

The tasks that Ms. Archangel said she accomplished would be difficult, if not impossible, if she could not read. Her testimony regarding her reading ability, which statement was correct, and what she actually saw and heard was confusing and difficult to understand. The jury could have reasonably determined her testimony was not credible or reliable.

Amanda Meche testified she was speaking to the defendant on the telephone on April 2, 2012, when he told her the police had arrived. She heard the officer "yelling obscenities at him and telling him to put his mother f-ing dogs up." She said the officer continued to curse at the defendant as the defendant asked what he did wrong and if he could be taken to jail for letting his dog use the bathroom on private property. For "maybe two or three minutes[,]" she "could hear just beating and yelling and cursing on the other end from [the defendant] yelling and saying 'What did I do?' And [she] heard the officer just ke[ep] cursing at him and never once told him what he did wrong at all." She "just listened until the phone hung up at him beating him . . . about five minutes total." She said she heard the defendant scream for help as he was being beaten, and she could tell who was hitting and who was being hit. She maintained the defendant never swore at the officer.

Ms. Meche further testified she heard the defendant "hollering, 'Ou, ou, ou,'" and insisted she could tell "who's hitting who." She heard the noise the phone made when it fell to the ground, and she "heard the licks" being hit. A

10

reasonable jury could determine Ms. Meche could not conclude which individual made which sounds under these circumstances.

Kyestle Thomas also testified. She is the mother of the defendant's two children. She testified she was "in the kitchen with the kids" when she heard loud noises outside. She heard someone yell "[p]ut your f_ _ _ing dogs up[.]" When she went outside, she heard the defendant ask why, and the officer repeated himself, saying he would arrest the defendant if he did not put the dogs away. Officer Cormier began hitting the defendant "with his black police stick." When the defendant tried to get away and go in the house, Officer Cormier followed him under the carport. The defendant "tried to block himself from getting hit and grabbed [Officer Cormier's] arm." Officer Cormier "threw [the defendant] on the car, started hitting him." Officer Credeur arrived and "Tased [the defendant] in the chest, and he went down on the ground" while the defendant leaned against the car with Officer Cormier "on him, hitting him" over the head with the black baton. Ms. Thomas said she never saw the defendant swing at the officer or put him in a headlock. Ms. Thomas never knew the defendant's dogs to leave the yard.

The defendant testified he was on the phone with Ms. Meche when he let his dogs out of their kennel. He saw Officers Cormier and Credeur pass, and Officer Cormier waved at him. They went down the street, talked to someone for about five minutes, "[t]hen all of a sudden," one officer came back down his street and pulled into his driveway.

The officer, who the defendant identified at trial as Officer Joseph Cormier, rolled down his window and said, "Put your f_ _ _ing dogs in the cage." The defendant questioned what he had done wrong, and the officer said, "Put your f_ _ _ing dogs in the cage or I'm going to place you under arrest." The defendant

pointed out the "No Trespassing" signs posted on his home and asked if the officer was going to arrest him for not putting his dogs up. The officer took out his baton and started striking the defendant. The defendant said he grabbed the officer's hand, and the officer "just start[ed] pounding on [his] head," and the defendant broke away from him. He tried to go in the house, but the officer grabbed him from the doorway and threw him on the top of his car in the carport.

The defendant leaned back on the car with the officer choking him. The defendant "grabbed him tight," and the officer "got his baton and just started banging [him] on [his] head and banging [him] on [his] head." The defendant then felt a shock, he started shaking, and he was on the ground. Officer Cormier started asking him, "Where's the dope? . . . Where's the drugs?" Officers Cormier and Credeur would not allow the defendant to put his dogs back in their kennel; "they just threw [him] in the car." He said he was never told he might be a suspect in a crime. He denied ever having Officer Cormier in a chokehold. Even though other witnesses testified in detail about the comments they heard from the officers and the defendant, no one other than the defendant testified he/she heard the officers ask the defendant anything concerning drugs.

The three dogs were a Rottweiler, a Chinese Shar-Pei, and a brown Chinese Shar-Pei and Rottweiler mix. The defendant said he trained them to stay within the boundaries of his property, and they have never strayed from it. He testified they had never in their lives been on the street.

Police charged the defendant with "dogs at large, resisting arrest violently with force, and battery on a police officer." The defendant testified his refusal to put away his dogs led to the incident. He said he was never arraigned on the charge related to his refusal to put his dogs up, and he thought it "got dropped."

12

The defendant complains about perceived contradictions between the testimony of Officer Cormier and Officer Credeur. Officer Cormier did not mention being lifted off the ground while the defendant had a chokehold on him. Officer Credeur did not mention a suspect in a white shirt or Officer Cormier being lifted off his feet in his police report, but he testified to that at trial. He did not take a statement from Ms. Thomas, who was close to the altercation, and he did not see the defendant's dogs in the street. As Officer Credeur explained, "Not all officers on the scene have to see the same crime committed . . . for it to be an arrestable offense or a citation issued."

Further, the defendant questions Officer Credeur's memory of the incident. Officer Credeur's report stated he heard Officer Cormier place the defendant under arrest, but at trial, he testified he heard nothing that took place between Officer Cormier and the defendant. Officer Credeur felt his memory of the event was better at trial than at the time he wrote the report. He testified he "had to rush" the report because his supervisor wanted it before he left for the day, and it was "done quickly, because at the time [he] was already officially off of work."

"Resisting an officer is the intentional interference with, opposition or resistance to . . . a . . . lawful detention . . . when the offender knows or has reason to know that the person arresting, detaining, seizing property, or serving process is acting in his official capacity." La.R.S. 14:108(A). "A law enforcement officer may stop a person in a public place whom he reasonably suspects is committing, has committed, or is about to commit an offense and may demand of him his name, address, and an explanation of his actions." La.Code Crim.P. art. 215.1(A). A "public place" may include private property when an individual, although located on private property, is in an area where he has no expectation of privacy, is visible

13

to the public, or is "exposed to public view, speech, hearing, and touch[.]" *State v. Palmer*, 09-44 (La. 7/1/09), 14 So.3d 304, 309 n.2 (citing *Hester v. United States*, 265 U.S. 57, 44 S.Ct. 445 (1924)).

In *State v. Kinard*, 12-446 (La.App. 5 Cir. 11/27/12), 105 So.3d 974, *writ denied*, 12-2745 (La. 10/25/13), 124 So.3d 1090, the fifth circuit determined an officer was justified in placing a suspect in handcuffs after he approached the suspect's vehicle for obstructing traffic, and a gun fell from the vehicle. The court noted the officer's right "to stop and interrogate those reasonably suspected of engaging in criminal activity" as recognized by La.Code Crim.P. art. 215.1. *Kinard*, 105 So.3d at 978. Also, the fifth circuit noted an officer's authorization "to take such steps as are reasonably necessary to protect his safety and to maintain the status quo[.]" *Id.* at 979.

Officer Cormier had learned of a brutal crime involving a black man wearing a white shirt with a tan dog just before he, according to his testimony, saw a tan dog in the street and traced it to a black man wearing a white t-shirt. Thus, he was lawfully allowed to detain the defendant, who was visible to the public albeit on private property, to determine whether he had committed the offense. Officer Cormier could lawfully take the step of asking the defendant to restrain potentially dangerous dogs to protect his safety. The defendant resisted that lawful detention when he refused to cooperate with Officer Cormier's reasonable request. Officer Cormier was in uniform, and easily identifiable as a police officer. Accordingly, the testimony of Officers Cormier and Credeur establish all the elements of resisting an officer.

The testimony of the defendant's other witnesses, however, contradicts the officers' testimony. Based on the guilty verdict, the jury apparently accepted the

14

officers' testimony and rejected the testimony of the conflicting witnesses. The jury made credibility determinations that this court will not set aside, and those determinations established sufficient evidence to convict the defendant. These assignments of error lack merit.

## ASSIGNMENT OF ERROR NUMBER THREE

The defendant argues the trial court erred in failing to consider the Rayne City Ordinance Sec. 18-2, when the defendant's dogs were in his yard on private property. The issue of whether the dogs ever left the defendant's yard is of no moment. Even if the dogs were on private property in compliance with the ordinance, the officers still saw a man in a public place who fit the description of someone who had just committed a crime. He even had a dog that matched the description of the dog with the suspect. Thus, the officers were authorized to question the defendant regardless of whether he was in compliance with the Rayne city ordinance pertaining to dogs.

## ASSIGNMENT OF ERROR NUMBER FOUR

The defendant contends the trial court failed to consider whether the officers had probable cause to arrest him when he "was merely outside s[pea]king on the phone watching his well trained dogs urinate and thus became the subject of a violent tirade by Officer Joseph Cormier." However, the defendant fit the description of a crime suspect. He refused to cooperate by putting his dogs away in the interest of officer safety when he was lawfully approached. He resisted a lawful detention by someone he knew to be a police officer. As discussed above, the officers had probable cause to arrest the defendant. This assignment of error lacks merit.

15

## CONCLUSION

The trial court is directed to inform the defendant of the provisions of La.Code Cr.P. art. 930.8 by sending appropriate written notice to the defendant within ten days of the rendition of this opinion and to file written proof in the record that he received the notice. The defendant's conviction is affirmed.

**AFFIRMED.**