CLARK, Justice.
|,We granted the state’s writ to consider the correctness of the appellate court’s decision which reversed the trial court’s denial of a motion to suppress evidence.
FACTS AND PROCEDURAL HISTORY
In this criminal matter, the defendant, Larry John Thompson, was charged by bill of information with possession with intent to distribute a Schedule II Controlled Dangerous Substance (cocaine), a violation of La. R.S. 40:967(A)(1). The charge arose out of the defendant’s arrest on May 29, 2008, at the Levingston Motel in Shreveport, Louisiana. Thompson, who claimed to be visiting his girlfriend and a friend at the motel, encountered police executing search warrants for two motel rooms. While being questioned by the officers, Thompson admitted he had been previously convicted of a felony and stated he possessed both a gun and crack cocaine in his truck, parked nearby in the motel’s parking lot. He gave officers permission to search his truck, both verbally and on a written consent form. He then recovered rocks of crack cocaine from the truck and gave them to the officers.
During pretrial discovery, Thompson filed a motion to suppress evidence, claiming the consent to search was the product of an illegal detention. Thompson asserted he was caught in transit near one of the rooms named in the search warrant 12and was illegally searched and questioned, which vitiated any consent he may have given. Since the prosecution resulted in a guilty plea, the facts are derived from testimonial and physical evidence adduced in two pretrial hearings held on Thompson’s motion to suppress evidence.
The first hearing on the defendant’s motion to suppress was held on April 1, 2009. The state presented the testimony of Agent Shawn Parker, an experienced member of the Shreveport Police Department, then working with the Street Level Interdiction Unit. Agent Parker had been trained in executing search warrants and had made “thousands” of arrests.
On May 29, 2008, Agent Parker was part of the Special Response Team (“SRT”) *557 executing search warrants for two separate motel rooms — Rooms 31 and 37 — at the Levingston Motel in Shreveport.[1] This motel was well-known to law enforcement officers for narcotics trafficking and prostitution. Hundreds of arrests had been made at this motel over the past ten years and the police consider the motel itself a high crime area. Agent Parker testified, in his experience, narcotics and guns are usually found together, and narcotics search warrants present a very dangerous situation for law enforcement officers and the community at large. This potential for danger to officers and citizens was one of the reasons why the Shreveport police developed the SRT for street level interdiction.
For this operation, three SRT members were assigned to each room made the subject of the warrants as the entry team.[2] Other SRT members served as backup, providing security for the entry teams. Agent Parker was a part of the backup team executing the warrant for Room 31. In all, twelve SRT officers participated in executing the narcotics search warrants.
| oAgent Parker testified the SRT, dressed in tactical gear, executed the search warrants during daylight hours, around 3 p.m. Agent Parker described the motel as similar in shape to the letter “J.” The motel has a ground floor and a second floor with multiple rooms. When the officers arrived, he saw several of the doors to the motel rooms were open and people were coming and going. Agent Parker’s focus was primarily drawn to Room 31 and any persons he saw around that room. He testified that the door to Room 31 was open. He claimed he saw two African-American men standing outside the room and another African-American man, whom he later identified in-court as Thompson, leaning or standing in the open doorway of Room 31. He watched Thompson slowly step out of the room before walking away from the approaching SRT members.
As SRT entry team members approached the three men, they ordered everyone to the ground for safety. By the time Agent Parker and his backup team came into contact with these men, they were lying on the ground and handcuffed. Agent Parker explained the men were placed in handcuffs “[t]o detain them due to the number of them, and all the commotion going on.... to make sure they didn’t have any weapons.” According to Agent Parker, the danger of the situation for the officers was enhanced by the fact that two warrants were being executed simultaneously, as well as the number, and movement, of people at the location. After helping the men to their feet, Agent Parker advised them of their constitutional rights. He testified it was standard operating procedure for an officer to advise people of their Miranda[3] rights once they were detained or handcuffed.
According to Agent Parker, Thompson appeared to understand his rights. The officer claimed Thompson admitted he had been arrested in the past. Thompson provided to the officer his name, date of birth, and residence address at Agent Parker’s request. Agent Parker then conducted a pat-down search and | determined Thompson had no weapons or illegal substances on his person. Thompson’s identification, obtained with his consent during the pat- *558 down search, verified the personal information Thompson told the officer. Agent Parker testified he removed Thompson’s handcuffs at this point.
Agent Parker then asked Thompson some questions trying to determine what he was doing at the motel because his identification showed he lived elsewhere. Thompson told the officer he was visiting a friend and he had a girlfriend who lived at the motel. When Agent Parker asked him how he arrived at the motel, Thompson pointed to a blue and white Ford pickup truck parked almost directly in front of the rooms. When Thompson was asked whether there was anything illegal in the vehicle, he stated he had a gun in the truck.
According to Agent Parker, this information raised concerns for him as an officer in a volatile situation. If released from detention, he believed Thompson would have access to a weapon approximately ten feet away. Agent Parker stated this could present a danger to the law enforcement officers who were on the scene conducting searches and interviews in connection with the search warrants. Agent Parker explained to Thompson his concern to secure the weapon for safety due to all of the circumstances,
Thompson indicated he was a little shaken. He admitted he was a former felon, was not supposed to have a gun in his possession and did not want to get into trouble. Agent Parker walked Thompson away from the other men being questioned, told Thompson his focus was now on recovering the weapon, and asked Thompson if he could retrieve the gun from the truck. Thompson then apparently changed his mind and denied having a weapon.
The fact Thompson changed his story raised further concerns for Agent Parker. Thompson now claimed he did not have a gun, and attributed his earlier assertion to nervousness. Trying to figure out what was true, Agent Parker again tasked Thompson whether he had anything illegal in the truck. Thompson admitted he had some crack cocaine which he had purchased for himself and his girlfriend. Thompson claimed smoking crack helped with his heart problems.
Given Thompson’s admissions, Agent Parker could not just walk away, and told Thompson so. At this point, Agent Parker was certain Thompson had committed or was committing criminal activity. The officer asked Thompson if he could retrieve the weapon and the cocaine; Thompson indicated he had “no problem” with that. After being assured his truck would not be impounded, Thompson gave both verbal and written consent to the search.
After Thompson signed the consent to search form, he opened the truck’s door on the driver’s side with keys he pulled from his pocket. Thompson then reached in, opened the armrest that folded up into the bench seat and pulled out a clear plastic baggy. Inside the baggy were five individually packaged rocks which field-tested positive for cocaine. Thompson was then arrested for possession of the crack cocaine with the intent to distribute. No gun was found in the truck.
On cross-examination, Agent Parker acknowledged he was not familiar with the investigation leading up to the securing of the search warrants. Instead, he was only called to help participate in the warrants’ execution. When asked why he continued to question Thompson after Thompson provided identification and the pat-down revealed no drugs or weapons, Agent Parker responded that he did not know whether Thompson had a connection to the narcotics activity which resulted in the warrants. Therefore, Agent Parker con *559 tinued to question Thompson to determine whether he had a role in the recent narcotics activities at that location.
Agent Parker estimated the handcuffs were removed from Thompson after five to ten minutes of questioning. After the handcuffs were removed, however, Agent Parker acknowledged Thompson was still being detained as part of the investigation into the drug sales in the target rooms and was not free to leave. 1 (Agent Parker explained Thompson’s continued detention was based on Thompson’s statement that he was visiting a friend in Room 31, which was one of the targets of the search warrants.
Agent Parker admitted Thompson’s truck had nothing to do with the search of Rooms 31 and 37, but Thompson’s mention of a gun in the nearby vehicle necessitated further investigation. Thompson was again placed in handcuffs after he gave Agent Parker the crack cocaine from his truck. Thompson told Agent Parker he did not obtain the cocaine from the motel.
Agent Parker returned Thompson’s identification to him at the time Thompson signed the consent to search. Two other vehicles, those in front of Room 31, were also searched, as well as their owners. Agent Parker explained Thompson’s truck was not parked directly in front of Room 31, but was parked to the side at an angle.
The suppression hearing continued with the defense calling to the stand Agent Steve McKenna. Agent McKenna was an SRT member who was part of the entry team for Room 31. Like Agent Parker, Agent McKenna did not participate in the investigation which resulted in the issuance of the search warrants. His participation was similarly limited to being a member of the SRT executing the warrants.
As he approached Room 31, Agent McKenna saw Thompson come out of the door of that room and turn toward his vehicle in the parking lot. At that point, the defendant’s truck was approximately 45 feet away. When Thompson was ten feet away from the officer, Agent McKen-na ordered him to the ground and handcuffed him. Agent McKenna then entered Room 31 to secure the room. Within five to ten seconds, the room was secure. Later, Agent McKenna saw Thompson standing near his truck but could not recall whether Thompson was handcuffed or not.
|7The defense then called Robert Coll-eprn to testify. Colleprn lives in Room 42 of the motel on the second floor, and performs electrical work there. Colleprn switched out television sets for Thompson and his girlfriend in Room 29 just before the officers arrived. He testified the door to Room 29, which was open, has a direct view of the electric gate to the enclosed parking lot of the motel. As Colleprn picked up the television set he had just replaced and prepared to leave Room 29, he saw the officers drive into the parking lot and commented on their arrival. Thompson walked out of the room ahead of Colleprn and turned to the left. Colleprn, carrying a heavy television set, was following Thompson out of the room when he heard the officers telling everyone to get down. Colleprn immediately sat on the threshold of the door to Room 29.
According to Colleprn, the officers first started to head into Room 29, then stated, “oh, we got the wrong room,” before heading to the left toward rooms with a higher number. Due to the presence of a brick-sided wall to the left of the room, Colleprn could not see what was transpiring around the corner. About ten or fifteen minutes later, the officers told him he could go. He was never searched. Colleprn did not believe the officers ever entered Room 29, *560 but he could not be sure what happened after he left.
On cross-examination, Colleprn acknowledged he saw Thompson in handcuffs, and then saw him later out of handcuffs. He also admitted the time period between when the officers arrived and when he was allowed to leave could have been less than ten minutes.
The defense called the defendant as its final witness. Thompson confirmed he lived with his girlfriend in Room 29 of the Levingston Motel, although he also lived elsewhere. Thompson claimed he saw the officers enter the parking lot as he was leaving his room in front of Colleprn, but asserted he was walking to the motel’s trash can to look for discarded DVDs and CDs. In doing so, Thompson |sadmitted he had to walk past Rooms 30 through 33.
Although he heard the officers telling everyone to “hit the ground,” Thompson did not comply. Thompson claimed Agent McKenna slammed him to the ground and handcuffed him before running on to Room 31. Thompson confirmed that Agent Parker read him his rights before speaking with him and that he understood them.
Although Thompson admitted he knew the occupants of Room 31, he denied being in their room that day. Thompson agreed he told Agent Parker he was visiting a friend and his girlfriend, but denied he said the friend lived in Room 31. Thompson also denied giving Agent Parker consent to retrieve his identification, claiming instead the officer obtained his identification during the pat-down search without permission.
When he was initially reluctant to consent to a search of his truck, Thompson claims another officer, not Agent Parker, threatened to call the K-9 unit. This other officer told Thompson that if any contraband was found, the officer would impound his vehicle and search his “apartment.” Thompson claimed his handcuffs were only removed so that he could sign the consent form and not before. Thompson estimated he was kept in handcuffs for approximately 25 minutes.
According to Thompson, he had already walked past Room 31 and was between Rooms 32 and 33, on his way to the trash can, when he was brought to the ground by Agent McKenna. As to whether he ever told Agent Parker he had a gun in his truck, Thompson claimed he told two other agents he “could have a gun or anything in my truck as far as that goes.”
In his cross-examination testimony, Thompson denied telling Agent Parker he had been arrested before. He agreed Agent Parker read him his rights and that he understood them, but claimed he was actually questioned by two other officers. |flThompson admitted he told Agent Parker he smoked crack cocaine and that there was crack in his truck for his and his girlfriend’s use. He also confirmed they talked about smoking crack in connection with his heart problems. It was during this conversation that Thompson told Agent Parker: “I said if you want those two or three rocks I got in that truck I don’t have no problem with that thei’e.” He admitted he signed the consent form although he did not want to. He then unlocked the truck, retrieved the crack cocaine and gave the illegal drugs to Agent Parker. Thompson acknowledged he had prior convictions for two burglaries, illegal possession of stolen merchandise and distribution of cocaine.
During his testimony, Thompson claimed a surveillance camera had captured these events. Although he had not seen the video, Thompson claimed he was told by the Shreveport Police Department’s internal affairs division, with whom *561 he had lodged a complaint, that they had the video recording. At the end of the hearing, the trial judge indicated he would like to view the video recording of the incident, if one existed.
A second hearing was held on April 13, 2009. Through Thompson, the defense introduced three photographs allegedly taken by him several days after his arrest. Exhibit D-l is a view of the first and second floor of the motel, taken from the parking lot, showing Rooms 27 through 29, on the ground floor, and Rooms 87 through 39 above them. Thompson identified his truck parked in front of Room 27, which he claimed was where his truck was parked on the date of his arrest. Exhibit D-2 shows a view of the first and second floor of the motel, taken from the parking lot, showing Rooms 29 through 32 and Rooms 39 through 42 above them. Thompson identified the car- parked in front of Room 30 as belonging to a resident of the motel who lived upstairs. He claimed the car was parked in the same place on the date of his arrest. He pointed out that Room 30 was on the opposite side of the brick-faced wall from Room 29. The picture shows that Room 31, to the right | mof Room 30 on the photograph, has an open staircase with a railing in front of it. Exhibit D-3 is a view of the first floor of the motel, taken from the parking lot, showing Rooms 32 and 33 where the defendant asserts he was placed on the ground by Agent McKenna.
During his second cross-examination, Thompson again admitted that in walking toward the trash can at the motel, he would have walked in front of Rooms 30 to 33 but denied that he was taken into custody in front of Room 31. He doubted the officers, when they pulled up, would have seen him in front of Room 31 because he saw the officers arrive at the motel before he left Room 29. Thompson saw the officers first run toward a black car in the parking lot. He saw Agent McKenna coming toward him, and other officers running upstairs. He thought he saw one officer run into Room 29.
Thereafter, the surveillance video/DVD was discussed by the court and the attorneys. The origin of the recording remains unclear. The prosecutor stated the surveillance video/DVD had a connection with the Shreveport Police Department, but had nothing to do with narcotics enforcement and was unknown to the narcotics officers executing the warrant in this matter.[4] The prosecutor also related that the officers had reviewed the DVD, but the state elected not to have them return for further questioning or explanation because the state’s position had not changed. The defense, however, requested that the video recording be shown with commentary by the defendant. Although the video recording was not moved into evidence by either the state or the defense at the hearing, the trial court placed the surveillance video/DVD into evidence by subsequent order.
| nThe surveillance video/DVD shows various views of the Levingston Motel for a roughly 30 minute time period alleged to *562 be between 3:00 to 3:30 p.m. on May 29, 2008. The camera’s location was high enough so that a portion of the motel, the surrounding gate, and parking lot are seen. Foliage from trees blocks the view of the portion of the motel between Rooms 29 and 30 and thereafter on the first floor and the corresponding rooms on the second floor. The majority of the video recording has nothing to do with the incident at issue, except that the defendant can be seen leaving Room 29 and going several times to his truck in the parking lot.
Approximately 26 minutes into the video recording, the SRT officers drive into the parking lot in several vehicles and the SRT entry teams deploy to the right along the first floor to reach the search warrant target of Room 31, outside of the camera angle, as well as to the left and up the stairs to reach Room 37, the other search warrant target. Thompson, who identified the clothes he was wearing, can be seen leaving Room 29 as soon as the officers’ vehicles enter the parking lot and moving quickly toward apartments on the first floor with a higher number. The occupants of a car which had been backing into a parking space between Rooms 28 and 29 are detained by the officers. Thompson is seen being escorted back to a location in front of Room 29, apparently in handcuffs. The video recording ends before any of the detained men are questioned. After viewing the video recording and listening to the arguments of counsel, the trial judge indicated he would render his opinion at a later date.
On April 22, 2009, the trial court denied the defendant’s motion to suppress in open court based upon the officer’s testimony, the court’s review of the video recording and the defendant’s pictures. Concluding Thompson’s consent was given freely and voluntarily, the trial court found it unnecessary to determine whether the initial detention was valid or not.
| ^Thereafter, Thompson moved to withdraw his former plea of not guilty and pleaded guilty to the charge pursuant to State v. Crosby, 338 So.2d 584 (La.1976), reserving his right to appeal the trial court’s ruling on his motion to suppress. The trial court accepted the guilty plea after finding the plea to be freely and voluntarily given. Thompson was subsequently adjudicated a fourth felony offender and sentenced to life imprisonment without the benefit of parole, probation, or suspension of sentence. The trial court also fined Thompson $3000 plus court costs, in default of which defendant was sentenced to an additional 60 days in parish jail. 'A subsequent motion to deviate from the mandatory life sentence was denied by the trial court.
On appeal, the appellate court found the evidence against Thompson was obtained during an illegal detention. According to the court of appeal, the district court erred both by disregarding the legality of the initial detention and by concluding the state met its burden of proving that the warrantless search was justified by consent which was not sufficiently attenuated from the “arguably illegal detention.” The court of appeal reversed the trial court’s denial of the defendant’s motion to suppress, vacated the guilty plea and sentence and remanded for further proceedings.[5] A separate concurring opinion was rendered. Rehearing before a five-judge panel was denied, with one judge issuing a written dissent.
We granted the state’s writ of review to consider the court of appeal’s decision and now reverse, finding the analysis conduct *563 ed by the court of appeal was flawed in several respects.[6]
LAW AND DISCUSSION
The state argues the court of appeal improperly substituted its judgment for that of the trial court by conducting a de novo review of the underlying facts in this | ^matter. The state contends the evidence adduced at the suppression hearing, reviewed under the proper analysis, shows the defendant’s initial detention and subsequent consent to search comported with the law.
By contrast, the defendant notes the trial court never made a threshold determination of the legality of the detention, preferring simply not to rule, so that the factual determinations made by the court of appeal were not truly de novo. Although the defense concedes the initial detention of the defendant was legal, Thompson contends the officers went far beyond any legal detention by continuing to handcuff, restrain and question him until incriminating statements and his consent to search his vehicle were obtained.

Standard of Review

This court recently re-examined the standard which a reviewing court must apply to determine the correctness of a trial court’s decision relative to the suppression of evidence. State v. Wells, 2008-2262, p. 4-5 (La.7/6/10); 45 So.3d 577, 580-581. Initially, the State bears the burden of proving the admissibility of the evidence seized without a warrant when the legality of a search or seizure is placed at issue by a motion to suppress evidence. La.C.Cr.P. art. 703(D).[7] The trial court’s ruling on the matter must be afforded great weight and will not be set aside unless there is an abuse of discretion. Wells, 2008-2262, p. 5; 45 So.3d at 581.
The analysis may be further broken down into the component parts of the trial court decision. “When a trial court makes findings of fact based on the weight of the testimony and the credibility of the witnesses, a reviewing court owes those findings great deference, and may not overturn those findings unless there is no |14evidence to support those findings.” Wells, 2008-2262, p. 4; 45 So.3d at 580; State v. Hunt, 2009-1589, p. 6 (La.12/1/09); 25 So.3d 746, 751. Legal findings or conclusions of the trial court are reviewed de novo. Id.; State ex rel. Thibodeaux v. State, 2001-2510, p. 1 (La.3/8/02); 811 So.2d 875.
In this case, the trial court gave oral reasons in open court for its ruling denying the motion to suppress. After explaining that he had watched the video recording “over and over again,” as well as having taken voluminous notes from the suppression hearings and researching the law, the trial judge outlined the facts as he understood them, implicitly crediting the officer’s testimony. The trial judge then stated his observations from the video recording and testimony. As to whether Thompson was ever in the doorway of Room 31, the trial judge stated:
... I can’t see whether or not Mr. Thompson was by Room 31 or 32 when he was apprehended, but it would appear that he would be close to those rooms. Now, whether he was in the *564 doorway or not, I don’t know because the tape doesn’t show that. It’s my understanding that he was, at least according to Mr. Thompson, apprehended around — between 31 and 32. That does jibe with the tape and the fact that he was walking insofar as the time that the SRT Unit would have gotten there.[8]
The trial judge noted the testimony that the Levingston Motel is a high crime area where prostitution and narcotics trafficking take place and that the officers were acting pursuant to search warrants. Under the circumstances, the trial judge found the initial detention of Thompson was valid. “Mr. Thompson was detained, he was patted down for weapons which I think is appropriate.”[9]
The trial judge recognized one of the questions raised by the defense was whether Thompson “was improperly detained or detained for too long a period of time.” However, the trial judge stated in his oral reasons for judgment he did not know “if we are going to get there” due to the testimony of the police officers, again implicitly crediting Agent Parker’s testimony. The trial court concluded:
|1sThis Court finds that — and I’m not saying that this was an unlawful detention or not. I am saying that based upon the fact that Mr. Thompson gave them consent and this voluntary consent was, in fact, voluntary and freely given[,] this would be valid. And the case law indicates that a voluntary consent to search given after an illegal search or a detention is valid if it is given under circumstances which show no exploitation of the illegality. This Court isn’t saying that there was an illegality; however, it appears that there was a lawful consent given by Mr. Thompson to the officers, at least, according to Agent Parker. He indicated that he said, Yes, you can search my truck as well as Mr. Thompson signing the consent. Mr. Thompson even indicated in testimony that he consented as well. This Court finds that the consent given to Agent Parker by Mr. Thompson was freely and voluntarily [given] and that the search— that the cocaine found in the truck of Mr. Thompson was validly obtained and this Court will deny the motion to suppress by Mr. Thompson.[10]
Citing the proper standard of review, the court of appeal nevertheless disagreed with both the trial court’s factual findings and its legal conclusion. We will now review each of these component parts of the trial court’s decision to determine whether there was an abuse of its discretion in denying the defendant’s motion to suppress.

Factual Findings

Although acknowledging the surveillance video does not itself depict a suspect investigatory stop, the appellate court believed the Agent Parker’s testimony was contradicted by the actual facts depicted in the surveillance video. The court of appeal found three examples of factual testimony relied on by the state as justification for the initial and continued detention of Thompson which it believed were contradicted by the video recording. According to the appellate court, Agent Parker’s erroneous recollection of the facts could not have supported “reasonable and articulable suspicion” which would have otherwise justified an investigatory stop.[11]
*565 After our review, we find the video recording does not contradict the testimony of the officer. Moreover, the court of appeal’s analysis disregards the testimony of the defense witnesses, including Thompson, which support Agent Parker’s recollection of the facts.
The first example of a factual discrepancy found by the appellate court is whether Thompson was ever in the doorway of Room 31. The court of appeal held the surveillance video was consistent with the defendant’s testimony. The court on review found “[t]he defendant was never in the doorway of room 31.” [12]
Although the video recording shows Thompson leaving Room 29 at the moment the SRT officers’ vehicle entered the motel’s parking lot, we find it is not possible to know for sure whether or not Thompson subsequently entered or leaned into Room 31 because vegetation obstructs the view of that room. The trial judge acknowledged that fact by stating: “Now, whether he was in the doorway or not, I don’t know because the tape doesn’t show that.”
However, Agent McKenna, a witness called by the defense, supports Agent Parker’s testimony in this regard. Agent McKenna also testified he saw the defendant standing in or leaning in the doorway of Room 31 immediately before Agent McKenna brought Thompson to the ground and handcuffed him. Agent McKenna then went on to secure Room 31, the target of the search warrant. Even Thompson admitted he was in the area of that room at the time the officers approached and knew the occupants, although he denied being inside Room 31 that day.
Even if both officers were somehow incorrect on this point, there is 117testimony from which the conclusion could be drawn that Agent Parker, who had not participated in the investigation leading to the search warrants, reasonably, but mistakenly, believed Room 29 was Room 31. The fact that the officers executing the warrants may have been confused as to which room was actually Room 31 was brought up in Colleprn’s testimony, another defense witness. The video recording shows one of the SRT members stopping at the door to Room 29 before heading toward Room 31.
Regardless, the court of appeal’s extrapolation of what did or did not occur subsequent to the time the defendant left Room 29, without any support by the video recording, was erroneous. Since there was testimony which supported Agent Parker’s testimony, and the video recording does not contradict the testimony, the court of appeal impermissibly substituted its own judgment by making a factual finding which the trial court explicitly found could not be made, other than by making a *566 credibility determination in favor of the defendant.[13]
The other examples of factual discrepancies between Agent Parker’s testimony and the video recording found by the court of appeal concerned the relative position of Thompson’s truck. Our review of the factors considered by the trial court shows this fact was not mentioned by the trial court and may not have been relied upon for its ruling.[14] Nevertheless, our review shows there are no substantial discrepancies between the video recording and the testimony. A close 118review of Agent Parker’s testimony shows he never asserted the defendant’s truck was parked in front of Room 31, as stated by the court of appeal. Rather, he stated the truck “was parked almost directly in front of the apartments.”[15] The video recording confirms the defendant’s truck was parked in the line of parking spaces directly in front of the motel rooms.
On cross-examination, Agent Parker stated another car was parked in front of Room 31 and that the defendant’s truck was parked “beside that vehicle,” “to the side at an angle.”[16] The video recording and the photographs entered in evidence show the rooms of the motel are close together. Agent Parker testified the parking spaces do not correlate to the room numbers, and this fact is verified by the defendant’s exhibits.[17] There are approximately one and a half parking spaces for every two rooms. The video recording shows a car was parked in the parking space in front of Rooms 29 and 30. Although vegetation obstructs the view of the parking spaces beyond that point to the right, it appears there is no car parked between Room 30 and Room 31. At almost the same time as the officers arrived, a black car backed in to the one parking space between the defendant’s truck and this other car. Consequently, from Agent Parker’s perspective as an arriving SRT member, Thompson’s truck was parked to the side of the car closest to Room 31.
Finally, Agent Parker testified the defendant’s vehicle was “10 feet” away from Thompson.[18] The court of appeal disagreed, finding the video recording showed the truck was actually parked in front of Room 27 and “quite a number of parking spaces down from where the defendant *567 stood. There were also several 11flcars and a metal barricade between the defendant and the truck.” [19]
The court of appeal may have been misled by the photographs entered in evidence by the defense, and by the angles by which the pictures were taken when compared to the video recording. The defendant’s truck was parked in front of Room 27 in Exhibit D-l and Thompson claimed during the second hearing on the motion to suppress that the truck was parked in the same place at the time of his arrest.[20] Our review of the video recording shows the truck is parked one space over, before Rooms 27 and 28, and closer to Room 29 at the time of Thompson’s arrest. This fact was acknowledged by defense counsel at the time the surveillance video was played.[21]
The video recording also shows Thompson was relocated near Room 29 while still in handcuffs, about one and a half parking spaces away from his truck, before questioning even began. Agent McKenna confirmed that he saw Thompson “near his truck.”[22] Thus, the video recording actually supports Agent Parker’s testimony regarding the proximity of the defendant’s truck when he questioned Thompson. The relevance of the location of the defendant’s truck was that it was nearby. The possibility that there was a weapon in the vehicle caused Agent Parker to shift his focus to recovering the gun for the safety of the officers executing the narcotics search warrants.
Contrary to the defendant’s argument in this court, we find the trial court implicitly made credibility determinations and factual findings by reciting the facts as testified to by Agent Parker as the facts it relied upon for its ruling. In making 1¡^contrary factual and credibility determinations unsupported by the testimony, photographs or video recording, the court of appeal impermissibly substituted its judgment for that of the trial court.

Legal Conclusions

Our reading of the trial judge’s ruling shows he found Thompson’s initial detention and the officer’s pat-down for weapons “appropriate.”[23] The trial court additionally held Thompson’s consent to search his truck was given freely and voluntarily. Consequently, the trial court deemed it was unnecessary to make a legal determination whether the continued detention which preceded the consent was illegal or not.
The court of appeal disagreed, finding “the trial court erroneously disregarded the legality of the initial detention and concluded that the state met its burden of proving that the warrantless search was justified as an exception to the warrant requirement of the Fourth Amendment.”[24] Moreover, the reviewing court found Agent Parker’s continued questioning of Thompson after the pat-down search yielded no weapons or narcotics had the effect of transitioning the routine investigatory stop into an illegal detention. Because the appellate court found the detention was *568 illegal, the court of appeal could not agree with the trial court that Thompson’s subsequent consent was freely and voluntarily obtained. The court of appeal found Thompson’s consent was not sufficiently attenuated from the “arguably illegal detention” so as to be a product of his free will.[25]
In this court, the defense has conceded the initial detention of Thompson was valid. The record fully supports this concession, as will be discussed. However, Thompson argues his continued detention and questioning turned the initially valid detention into an illegal one, which vitiated any consent obtained thereafter.
The state contends Thompson was initially detained during an investigatory stop. In State v. Dobard, 2001-2629, p. 3 (La.6/21/02); 824 So.2d 1127, 1129-1130, this court held:
The Fourth Amendment of the United States Constitution and Article 1, Section 5 of the Louisiana Constitution protect persons from unreasonable searches and seizures. The police may not, therefore, make a warrantless arrest of a citizen without probable cause that the citizen has engaged in criminal conduct. State v. Tucker, 626 So.2d 707, 710 (La.1993). Additionally, while the police may briefly detain and interrogate an individual in a public place, they may make such an investigatory stop only if it is based upon reasonable, articulable suspicion that the individual has engaged in, is engaging in, or is about to engage in criminal activity. La.C.Cr.P. art. 215.1[26]; Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); Tucker, 626 So.2d at 710; State v, Andrishok, 434 So.2d 389, 391 (La.1983); State v. Chopin, 372 So.2d 1222, 1224 (La.1979).
“Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.” Graham v. Connor, 490 U.S. 386, 396, 109 S.Ct. 1865, 1871-1872, 104 L.Ed.2d 443 (1989); see Terry, 392 U.S. at 22-27, 88 S.Ct. at 1880-1883. The risk of harm to both police officers and citizens is often minimized if the officers exercise unquestioned command of the situation. Michigan v. Summers, 452 U.S. 692, 702-703, 101 S.Ct. 2587, 2594, 69 L.Ed.2d 340 (1981). “In determining whether the police possessed the requisite 122‘rainimal level of objective justification’ for an investigatory stop based on reasonable suspicion of criminal activity ... reviewing courts ‘must look at the totality of the circumstances of each case,’ a process which ‘allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available *569 to them that might well elude an untrained person.’ ” State v. Boudoin, 2010-2868, p. 1 (La.3/4/11); 56 So.3d 233, 234, citing State v. Johnson, 2001-2081, p. 2 (La.4/26/02); 815 So.2d 809, 811 and United State v. Arvizu, 534 U.S. 266, 273, 122 S.Ct. 744, 750-751, 151 L.Ed.2d 740 (2002) (internal quotation marks and citation omitted).
The record in this case fully supports the determination that the initial detention of Thompson was a valid investigatory stop. The officers were engaged in executing narcotics search warrants, “... the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence.” Summers, 452 U.S. at 702, 101 S.Ct. at 2594. Moreover, Agent Parker’s testimony that guns are frequently used in narcotic trafficking is a factor which increases the possibility of danger to the officers.
There was not one search warrant being executed, but two. The testimony of the officers and the video recording show that the targets of the two search warrants made it necessary for the executing officers to split their forces in two directions. Room 31 is positioned on the first floor of the motel and to the right of the location where the officers entered the motel’s parking lot. Room 37 is located on the second floor and is accessed by an open stairwell to the left of the officers’ position in the parking lot. The configuration of the motel and the multiple targets of the search warrants increased the possibility of danger to the executing officers.
The search warrants were being executed in a high crime area known for narcotics dealing and prostitution. Agent Parker testified the motel by itself qualified as a high crime area. Even the defendant’s trial counsel acknowledged | as“[t]he place is notorious, Your Honor.... [f]or prostitution and narcotics. There is no doubt about it.”[27] Activity consistent with both prostitution and narcotics dealing can be seen on the video recording and were alluded to in the defendant’s testimony.[28] Agent Parker testified the situation was fluid as people were coming and going in the parking area and the rooms of the motel. This factor was fully supported by the video recording.
Additionally, Agents McKenna and Parker observed Thompson standing or leaning in the doorway of Room 31, one of the target rooms of the search warrants. Defense witness Colleprn confirms Thompson walked off in the direction of Room 31 as soon as the officers arrived. From Coll-eprn’s testimony, we know the defendant was aware of the officers’ presence in the parking lot before he left Room 29. The video recording does not contradict the officers’ testimony because Room 31 cannot be seen. Even considering only *570 Thompson’s testimony, it is clear the defendant was in the immediate vicinity of Room 31 at the time the officers arrived at the motel parking lot to execute the search warrants.
Based on the totality of the circumstances, it was reasonable for the police officers to briefly detain those persons in and immediately around the target rooms of the search warrants to ascertain their identities, maintain the status quo over a large physical area, and seek an explanation of their presence near (or at) the scene of the suspected narcotics distribution operation. Further, the officers made a reasonable decision to detain all the individuals in and around Room 31 and Room |2,i37, and thereby take unquestioned command over a fluid and uncertain situation. Boudoin, 2010-2868, p. 3; 56 So.3d at 235.[29]
We do not find that the nature of the investigatory stop was turned into an arrest when Agent Parker read the detained men their constitutional rights. Agent Parker testified the standard operating procedure was to Mimndize all persons detained or arrested. We find this procedure comports with La. Const, art. 1, § 13. In addition, we cannot fault the officer for providing Thompson with greater protection than he might otherwise have had in an investigatory stop.
Likewise, the officers’ use of handcuffs to affect the detention did not escalate this investigatory stop into an arrest for which probable cause was required. “Even granting the reasonableness of [Agent McKenna’s] decision to detain [Thompson], the officer’s use ■ of handcuffs poses a separate question, as a search or seizure ‘reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity and scope.’” State v. Porche, 2006-0312, p. 7 (La.11/29/06); 943 So.2d 335, 339, citing Terry, 392 U.S. at 18, 88 S.Ct. at 1878. In Porche, this court canvassed state and federal law on this issue:
... the use of handcuffs incrementally increases the degree of force used in detaining an individual. Mena, 544 U.S. at 99, 125 S.Ct. at 1470 (“The imposition of correctly applied handcuffs on Mena, who was already being lawfully detained during a search of the house, was undoubtedly a separate intrusion in addition to detention in the converted garage.”); State v. Broussard, 00-3230, p. 4 (La.5/24/02), 816 So.2d 1284, 1287 (“ ‘There is no' question- that the use of handcuffs, being one of the most recognizable indicia of a traditional arrest, substantially aggravates the intrusiveness of a putative Terry stop.’ ”) (quoting United States v. Acosta-Colon, 157 F.3d 9, 18 (1st Cir.l998)(internal quotation marks omitted)). Thus, because the police conducting an investigatory stop “may not ... seek to verify their suspicions by means that approach the conditions of arrest,” Florida v. Royer, 460 U.S. 491, 499, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983), the use of handcuffs must appear objectively 12r,reasonable “in light of the facts and circumstances confronting [the police],” taking into account “the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, *571 uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation.” Graham, 490 U.S. at 397, 109 S.Ct. at 1872; Broussard, 00-3230 at 4, 816 So.2d at 1287 (“ ‘Thus, when the government seeks to prove that an investigatory detention involving the use of handcuffs did not exceed the limits of a Terry stop, it must be able to point to some specific fact or circumstance that could have supported a reasonable belief that the use of such restraints was necessary to carry out the legitimate purpose of the stop without exposing law enforcement officers, the public, or the suspect himself to an undue risk of harm.’ ”) (quoting Acosta-Colon, 157 F.3d at 18-19). If the added intrusion is not warranted under particular circumstances, a Terry stop may escalate into a de facto arrest requiring probable cause to render it valid. United States v. Melendez-Garcia, 28 F.3d 1046, 1053 (10th Cir.l994)(“Because the specific nature of this stop [in which defendant was handcuffed and strapped into a police cruiser] was not justified under the Terry doctrine, we must treat it as an arrest, requiring probable cause.”); Broussard, 00-3230, pp. 3-4, 816 So.2d at 1287 (“[B]revity alone does not always distinguish investigatory stops from arrests, as the former may be accompanied by arrest-like features, e.g., use of drawn weapons and handcuffs, which may, but do not invariably, render the seizure a de facto arrest.”) (citing Acosta-Colon, 157 F.3d at 18-19)(emphasis added).
Id., 2006-0312, p. 7-9; 943 So.2d at 339-340.
Although “the well-known association of drugs and firearms does not invariably justify the use of handcuffs in detaining persons short of formal arrest,” each case must turn on its particular circumstances. State v. Palmer, 2009-0044, p. 9 (La.7/1/09); 14 So.3d 304, 310. Agent Parker testified to his experience that guns were often found in connection with narcotics dealing. He conducted a pat-down search of the defendant to ensure Thompson was not armed. The record supports the conclusion that the location was notorious for criminal activity. He therefore had an objective belief that such was a possibility.
Here, the officers were simultaneously exercising two narcotics search warrants, a type of investigation known to endanger officers with the possibility of sudden violence. A neutral and detached magistrate had already found probable cause of criminal activity in the area and authorized warrants to search. Agent 12(;Parker’s role in the encounter was to protect the entry teams from harm and to prevent individuals from running away.
Moreover, the experienced officers were aware that seemingly innocent individuals in the location of narcotics dealing may nevertheless be connected to that criminal activity, acting in the form of lookouts. A police officer observing Thompson’s movements of leaving his motel room (which we know from Colleprn’s testimony had an unimpeded view of the entrance gate to the motel parking lot) at the moment the officers arrived, walking in the direction of Room 31 (a target of the search warrants), and standing in or leaning in the room where he admitted he knew the occupants, could reasonably lead the officers to conclude that Thompson was somehow connected to the narcotics activity under investigation.
Further, the record supports the conclusion that the use of handcuffs to detain the defendant was brief. Agent Parker testified the handcuffs were removed after the pat-down search established Thompson was unarmed and carried no contraband. *572 Testimony by defense witness Colleprn confirmed the brevity of the handcuff use. He testified he saw Thompson both handcuffed and without handcuffs. He also stated he was released to return to his room no more than 15 minutes later, and in possibly less than 10 minutes. Considering the totality of the circumstances, the officers’ use of handcuffs to accomplish Thompson’s initial detention appears objectively reasonable in light of the facts and circumstances confronting the officers. The nature of the investigation and the size of the location covered by police, combined with the number of persons detained, constituted the particularized circumstances which justified the use of handcuffs on Thompson. See Palmer, 2009-0044, p. 9; 14 So.3d at 310.
The next issue is whether Thompson’s detention rose to the level of an unlawful arrest before police obtained sufficient probable cause through ^investigation to lawfully arrest him. The record is clear that Thompson was still detained and was not free to leave even after the handcuffs were removed. The court of appeal recognized that “the officers here are permitted to question the defendant’s connection to the room and/or his potential to pose a danger to officer safety,” but held that at the moment the officers did so, i.e. by continuing their investigation after the pat-down search was negative for contraband or weapons, “the routine investigatory stop transitioned into an illegal detention.”[30]
We find, as we did in Palmer, supra, that Agent Parker’s effort to investigate Thompson’s possible connection to Room 31 after the pat-down search,
... did not unduly prolong the encounter, as a brief detention “ ‘in order to determine [an individual’s] identity or to maintain the status quo momentarily while obtaining more information,’ [is] the hallmark of an investigatory stop.” Porche, 06-0312 at 6, 943 So.2d at 339 (quoting State v. Fauria, 393 So.2d 688, 690 (La.1981)). Cf. [Muehler v.] Mena, 544 U.S. [93] at 101, 125 S.Ct. [1465] at 1471[, 161 L.Ed.2d 299 (2005)] (questions asked by police during lawful detention of an individual do not constitute an additional seizure within the meaning of the Fourth Amendment because “ ‘[e]ven when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual; ask to examine the individual’s identification; and request consent to search his or her luggage.’ ”) (quoting Florida v. Bostick, 501 U.S. 429, 434-35, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991)).
Palmer, 2009-0044, p. 10; 14 So.3d at 310. Considering Thompson’s actions observed by Agent Parker after the officers’ arrival, and the officer’s duty to protect the entry teams and other officers conducting investigations, Agent Parker had an objective and reasonable basis for continuing his investigation into Thompson’s reasons for being in the immediate area of the search warrant’s target. Once the officer determined the blue and white truck was Thompson’s, Agent Parker acted reasonably to try to exclude the possibility that Thompson might have a weapon which could harm him or the other officers executing the search warrants. Whether parked in front of Room 27 or closer to Room 29, the truck was parked between the rooms targeted by the search warrants and was realistically | ¡^accessible by the *573 defendant if Agent Parker had released him from the brief detention.
As it occurred, the revelation that Thompson might have a gun in his truck was part of a continuous sequence of events in his detention which lasted, even by Thompson’s reckoning, no longer than BO minutes.[31] Thompson admitted he mentioned the presence of a gun to the officers. As the prosecutor argued to the trial court, once Thompson mentioned the gun and the fact that he was a convicted felon, the conversation became a “... whole new area. It no longer is about the Terry stop or the search warrant about the Room 31 or 37, now it’s about the criminal activity that he has indicated to officers post Miranda and that’s important because it was during that conversation he gave written and verbal consent to search the vehicle.”[32] Defense trial counsel apparently recognized Thompson’s statements led to the further investigation because his argument includes the following: “Maybe he said something he shouldn’t say but [to] just all of a sudden say upon this' point we’ve got a completely different thing I think is going a little too far because I think they had already gone far enough at the time they stopped him, searched him, found nothing.”[33]
Even though Thompson’s detention continued after the initial Terry stop revealed nothing incriminating, we hold the detention itself was not unreasonable under the circumstances, nor was its length, and the detention did not rise to the level of an arrest until police developed probable cause to do so. Once Thompson indicated, even in jest, that a gun might be present in his nearby vehicle, a | ^reasonable law enforcement officer would be remiss in his duties if he failed to continue to investigate. After discovering Thompson was a convicted felon, Agent Parker had probable cause to arrest Thompson for being a felon in possession of a weapon.
The fact Thompson may have been immediately outside, and not inside, the room targeted by the search warrants, is not of constitutional significance in our determination whether Thompson was legally detained. See Summers, 452 U.S. at 702 n. 16, 101 S.Ct. at 2594 n. 16 (“We do not view the fact that respondent was leaving his house [the subject of a search warrant] when the officers arrived to be of constitutional significance. The seizure of respondent on the sidewalk outside was no more intrusive than the detention of those residents of the house whom the police found inside.”). The defendant, who was walking outside his motel room, was not in an area where he had any expectation of privacy. La.C.Cr.P. art. 215.1(A) authorizes investigatory stops in a “public place.” This court has held “for purposes of the Fourth Amendment, the distinction is not between public and private property but between public and private spaces, and when an individual steps across the threshold of a home [or motel room] he enters a public place and [is] subject to seizure by the police acting upon probable cause for an arrest or reasonable suspicion for an investigatory stop.” Palmer, 2009-0044, p. 7 n. 2; 14 So.3d at 308 n. 2. Moreover, a *574 reasonable individual seeing and hearing the officers hastening to the motel rooms which were the target of the search warrants and shouting at all persons to get down, as the defendant admitted hé did, would not have ignored the officers’ commands. “[A] sensible person would not expect a police officer to allow people to come and go freely from the physical focal point of an investigation into faulty behavior or wrongdoing.” Brendlin v. California, 551 U.S. 249, 257, 127 S.Ct. 2400, 2407,168 L.Ed.2d 132 (2007).
Finally, we must determine in our analysis whether Thompson’s consent to lansearch was given freely and voluntarily, and was the product of a free will untainted by the exploitation of any illegality. The factual findings of the trial court underpinning this point were confirmed by Thompson himself when he admitted he consented to the search of his truck and signed the written consent to search form. However, the legal conclusion to be drawn from that factual finding, ie. whether the consent was tainted by illegality, will be reviewed de novo.[34]
“It is well settled that a search conducted without a warrant issued upon probable cause is per se unreasonable subject only to a few specifically established and well-delineated exceptions.” State v. Owen, 453 So.2d 1202, 1205-1206 (La.1984). Consent is one of the specifically established exceptions to the requirements of both a warrant and probable cause to a search. The state has the burden of proving the consent was given freely and voluntarily. Id., 453 So.2d at 1206.
In addition, if the consent was obtained after an illegal detention or entry, the consent was valid only if it was the product of a free will and not the result of an exploitation of the previous illegality. Among the factors considered in determining whether the consent was sufficiently attenuated from the unlawful conduct to be a product of a free will are whether the police officers adequately informed the individual that he need not comply with the request, the temporal proximity of the illegality and the consent, the presence of intervening circumstances and, particularly, the purpose and flagrancy of the official misconduct. Id., 453 So.2d at 1206 (citations omitted).
Here, the defendant was initially detained for his proximity and possible connection to the target of a narcotics search warrant which was being served in a notoriously high crime area. Thompson was then briefly questioned as part of the investigation to determine the reason for his presence and his connection, if any, to the narcotics activity at the location. We find the fact that Agent Parker retained Thompson’s identification while conducting his subsequent investigation did not, under these circumstances, serve as improper coercion. See State v. Martin, 2011-0082, p. 9-10 (La.10/25/11); 79 So.3d 951, 957 (determination of whether a seizure has occurred when a law enforcement officer retains an individual’s |S1 identification is a fact-intensive analysis in which a reviewing court must consider the totality of the circumstances). Here, the police already had objective and reasonable grounds to detain Thompson and to conduct further questioning. During this investigation, Thompson intimated, after having been Mirandized, that he possessed an illegal firearm in his truck. Defendant, no longer in handcuffs, continued speaking with police and additionally admitted to possessing crack cocaine in his truck. We have found the continued detention and questioning of Thompson was not illegal. Con *575 sequently, Thompson’s consent to search his truck cannot be a result of the exploitation of any illegality.
Moreover, with Thompson’s admissions, the police obtained probable cause to arrest him. Once he stated he possessed the illegal gun, and then the crack cocaine, Thompson’s consent to search his truck for either, whether voluntary or not, was unnecessary for police to gain lawful access to the truck as a search incident to arrest under Arizona v. Gant, 556 U.S. 332, 344, 129 S.Ct. 1710, 1719, 173 L.Ed.2d 485 (2009), since there was clearly a reasonable belief that evidence of the crime of arrest was in the truck.
We conclude, after our review of the facts and legal conclusions found by the trial court, there was no abuse of the trial court’s discretion in denying the defendant’s motion to suppress. Accordingly, the trial court correctly denied the defendant’s motion to suppress the evidence. The court of appeal’s decision to the contrary is reversed, the ruling of the trial court is reinstated, and this case is remanded to the court of appeal for its review of the remaining assignment of error raised by the defendant on appeal.
REVERSED AND REMANDED.
JOHNSON, Justice, concurs in result.

. The SRT is basically a SWAT unit.

. Although no search warrants were entered in evidence, the prosecutor referred to two search warrants during questioning. No one has put at issue that the police were one the scene to execute the search warrants.

.Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. “With that, Your Honor, the State has at this time just for clarity sake for the record we have obtained a video tape that was from the Livingston [sic] Motel from the date the incident occurred. This video tape was unknown to the narcotics officers, this had nothing to do with narcotics enforcement, this was something that had to do externally with SPD. We have now obtained the video through the defendant’s testimony enlightening us that there was an IA [Internal Affairs] complaint and we now have that video. I tendered a copy to defense counsel ... I’ve also tendered a, copy last Thursday to the Court. At this time I have no objection to showing the video at this time, the pertinent parts as it pertains to this investigation.” R., p. 175-176.

. State v. Thompson, 46,039 (La.App. 2 Cir.2/23/11), 58 So.3d 994.

. State v. Thompson, 2011-0915 (La.12/16/11); 76 So.3d 1187.

. La.C.Cr.P. art. 703(D) provides; "On the trial of a motion to suppress filed under the provisions of this Article, the burden of proof is on the defendant to prove the ground of his motion, except that the state shall have the burden of proving the admissibility of a purported confession or statement by the defendant or of any evidence seized without a warrant.”

. R., p. 191.

. R., p. 192.

. R., p. 192-193.

.The court of appeal observed: "For instance, Agent Parker testified the defendant was leaning in the doorway of Room 31, whereas the surveillance video clearly shows him coming out of Room 29, as testified by *565 the defendant. The defendant was never in the doorway of room 31; he was actually headed toward an area away from room 31 when the officers arrived at the motel. In order to reach room 31, the defendant had to walk around the partition between rooms 29 and 31. It is unlikely that he could have reached Room 31 in time to appear to arriving officers as though he was in its doorway. The surveillance video supports this reasoning and is consistent with the defendant's testimony. Second, the defendant’s truck is not parked in front of or even relatively near to Room 31 as testified to by Agent Parker. Rather, it ,is parked in front of Room 27. Lastly, Agent Parker’s testimony that defendant was ten feet away from his truck is also contradicted by the surveillance video, since the truck was actually quite a number of parking spaces down from where the defendant stood. There were also several cars and a metal barricade between the defendant and the truck.” Thompson, 46,039, p. 10-11; 58 So.3d at 1001-1002.

. Thompson, 46,039, p. 10; 58 So.3d at 1001.

.In his argument to the trial court, the prosecutor warned the court about being sent "on a wild goose chase” with regard to this point. Whether Thompson was actually going out of Room 29 or Room 31 was irrelevant to the state's case. The prosecutor argued Agent Parker "saw what he saw and believed Room 29 to be Room 31. None of that has anything to do with the validity of the State's arguments as to the conduct of the officers coming into contact with this defendant and that's the important thing." R., p. 179. "It doesn't matter because the officers had a right to come into contact with this defendant pursuant to the search warrants they were executing and to do at a minimum a Terry stop.” R., p. 182-183. "So the State's position is we can watch these tapes endlessly, we can take a court funded trip out to the Livingston [sic] Motel and we can look and see whether or not this is the accurate room, the pictures are portrayed accurately, it doesn’t matter because it’s still just a Terry versus Ohio stop. They had a reasonable basis to detain and come into contact with him and then it is through his post Miranda statements that he confessed to certain crimes which led to another investigation which led to verbal and written consent to search his vehicle and where the narcotics were found. I don't want to get caught up in this wild goose chase to give it some kind of merit because it makes no difference.” R., p. 183.

. R., p. 189-193.

. R., p. 81.

. R., p. 101.

. R., p. 101.

. R., p. 82.

. Thompson, 46,039, p. 10-11; 58 So.3d at 1002.

. R., p. 166.

. When the court asked whether Thompson’s car was in the same place on the video recording, defense counsel replied: "No, sir, it doesn’t look like it is. It looks like it's further over here at the time of this but it just shows the sequence of these apartments.” R., p. 177.

. R., p. 108.

. R., p. 191.

. Thompson, 46,039, p. 11; 58 So.3d at 1002.

. Thompson, 46,039, p. 12; 58 So.3d at 1002. We note the court of appeal did not make a certain determination as to the legality of the defendant’s detention, finding only that its illegality was "arguable.”

. La.C.Cr.P. art. 215.1 provides in pertinent part:
Art. 215.1. Temporary questioning of persons in public places; frisk and search for weapons
A. A law enforcement officer may stop a person in a public place whom he reasonably suspects is committing, has committed, or is about to commit an offense and may demand of him his name, address, and an explanation of his actions.
B. When a law enforcement officer has stopped a person for questioning pursuant to this Article and reasonably suspects that he is in danger, he may frisk the outer clothing of such person for a dangerous weapon. If the law enforcement officer reasonably suspects the person possesses a dangerous weapon, he may search the person.

. R., p. 147.

. Although the officers executing the search warrants were unaware of the activities recorded on the surveillance video, the video recording nevertheless may serve as evidence of the area’s criminality. During cross-examination of Thompson at the second hearing, the prosecutor followed a line of questioning about the defendant’s actions on the video recording before the police arrived. Men are seen arriving at Thompson’s room. He would leave and go to his truck, which contained individually packaged rocks of crack cocaine, for a few seconds. He would return to his room and the men would immediately leave. Thompson’s explanation for these activities was that men would come by to see if they could date his girlfriend and he left the room to give them privacy. Although Thompson denied his girlfriend was a prostitute, he admitted she had been one in the past. Regardless, the video recording shows behavior which could be consistent with either prostitution or narcotics dealing occurring out of Room 29.

. The concurrence makes the argument that the defendant was detained solely for his proximity to the search warrant target and that anything he did would have "landed him in the same position on the curb in handcuffs." Thompson, 46,039, p. 1; 58 So.3d at 1003. However, this argument is belied by the testimony of defense witness, Colleprn. Although Colleprn was briefly detained while the officers established control over the fluid situation and extended area, he was not searched, handcuffed or questioned.

. Compare Thompson, 46,039, p. 10; 58 So.3d at 1001 with Thompson, 46,039, p. 11, 58 So.3d at 1003.

.R., p. 124. Even if Thompson's testimony that the handcuffs remained on during the entirety of the encounter is credited, such an amount of time would not rise to the level of an illegal detention under the circumstances. See Mena, 544 U.S. at 99, 125 S.Ct. at 1470 (police officers executing search warrant of house seeking weapons and evidence of gang membership in wake of drive-by shooting acted reasonably under the circumstances by detaining occupant in handcuffs for two to three hours while search was in progress).

. R., p. 180.

. R., p. 184 (emphasis added).

. Wells, 2008-2262, p. 4; 45 So.3d at 580.